IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SUNQUEST PROPERTIES, INC. and
COMPASS POINTE APARTMENTS
PARTNERSHIP                                                                             PLAINTIFFS

v.                                                           Civil Action No. 1:08-CV-692-LTS-RHW

NATIONWIDE PROPERTY AND
CASUALTY INSURANCE COMPANY
and JOHN DOES 1-5,                                                                      DEFENDANTS

**MEMORANDUM IN SUPPORT OF NATIONWIDE'S MOTION TO STRIKE LEWIS O'LEARY AS PLAINTIFFS' "COMPETENT AND IMPARTIAL" APPRAISER**

Defendant Nationwide Property & Casualty Insurance Company moves to strike Lewis O'Leary as Plaintiffs' "competent and impartial" appraiser. Mr. O'Leary was appointed Plaintiffs' "impartial" appraiser after years of work helping Plaintiffs develop their insurance claim and litigation strategy, earning tens of thousands of dollars in the process. His pre-litigation work further earned him a designation as Plaintiffs' paid litigation "expert"—a role he has undertaken for Plaintiffs' counsel in at least three prior cases. In that capacity, he not only has staked positions on claims adjustment issues, but admittedly reached his "expert" conclusions without being presented or considering significant amounts of the evidence relating to Plaintiffs' loss. In short, Plaintiffs' insurance policy and prevailing law require a standard of appraiser neutrality that Mr. O'Leary falls far short of meeting.

### INTRODUCTION

The appraisal clause of the insurance contract at issue contains an express requirement that, upon written demand for appraisal by either party, "***each party will select a competent and impartial appraiser***." (*See* Nationwide Business Provider Policy, Form BPP-0006 (1-0294)

§ E.2 at NW-2SUN000102, Certified Business Provider Policy 63BP1397420004 (Ex.1).)[1] The remaining procedures set forth in that clause—which envision the selection of an umpire by the "competent and impartial appraiser[s]," submission of amount of loss by each "competent and impartial appraiser," and eventually a "binding" majority "decision" that requires the concurrence of at least one "competent and impartial appraiser"—cannot be validly conducted, and indeed should not take place at all, unless and until the preliminary requirement is satisfied. (*Id*.) To allow otherwise would be to taint the entire appraisal proceeding and render invalid any resulting award. In the spirit of this Court's view that, "[i]f done correctly, appraisal may benefit the ultimate resolution of this action," (June 8, 2009 Order at 4 [Dkt. 32]), and in light of the fact that Plaintiffs have once more placed before the Court issues regarding the conduct of the appraisal pursuant to the parties' contract, Nationwide submits that the Court should address the fitness of Plaintiffs' proffered appraiser, Mr. Lewis O'Leary, at this time.

Ample evidence of Mr. O'Leary's partiality currently exists, rendering him unqualified to serve as a "competent and impartial appraiser," as required by the appraisal clause in Plaintiffs' policy. This evidence exists despite this Court's August 18, 2009 Order prohibiting any discovery related to the appraisal, and has arisen because of the numerous and central roles that Mr. O'Leary has played in advancing Plaintiffs' claim prior to any appraisal. (*See* Aug. 18, 2009 Order at 2-3 [Dkt. 80].) Simply put, a person who has been paid to work for several years on the development of a claim and continues to be paid to support that claim, is not sufficiently "impartial" to pass judgment of any kind upon that claim. Yet this is precisely what Plaintiffs suggest in nominating Mr. O'Leary. Nationwide therefore requests that Mr. O'Leary be stricken as Plaintiffs' "competent and impartial appraiser" and that this Court direct Plaintiffs to comply with this Court's prior Order and select a duly qualified and "impartial" candidate prior to the

---

[1] Emphasis added unless otherwise noted.

2

selection or appointment of an umpire or the initiation of any other steps in the contractually defined appraisal process.

## BACKGROUND

On August 18, 2009, this Court issued an Order granting Plaintiffs' Motion for an Appraisal of the Entire Loss, and directing the parties to "select someone who they sponsor as a ***competent and impartial*** appraiser." (Aug. 18, 2009 Order at 3.)  Subsequent to entry of the Court's Order, Plaintiffs elected to continue with Mr. O'Leary as their chosen appraiser—after first nominating him in their initial appraisal demand of July 2009, (*see* Aug. 20, 2009 Letter N. Gaudet to L. Hill (Ex. 2))—despite the fact that he had been performing consulting services for Plaintiffs relating to the claim at issue as early as May of 2007.  Nationwide selected Mr. David Horton, an experienced and unbiased appraiser who had no prior involvement in Plaintiffs' claim.

As the Court further provided in its August 18 Order, the two appraisers named by each party were to confer and select an umpire. (Aug. 18, 2009 Order at 3.)  In the event that the appraisers could not "agree on an umpire," the parties were directed to "request this Court to appoint one." (*Id*.)  As detailed in Nationwide's simultaneously filed Response in Opposition to Plaintiffs' Motion to Appoint Umpire and Cross-Motion to Appoint Umpire Nominated by Nationwide, the named appraisers have, since this Court's August 18 Order, conferred with one another and traded information regarding prospective candidates.  After each rejected the others' initial slate of candidates, Mr. Horton wrote to O'Leary to suggest additional candidates and to indicate that he would be continuing his search for qualified candidates.  (*See* Sept. 27, 2009 Letter D. Horton to L. O'Leary (Ex. 3).)

Rather than allowing the two named appraisers to continue their efforts at identifying a mutually agreeable umpire, Plaintiffs have seen fit to interrupt that process by seeking this Court's intervention in selecting an umpire.  As Plaintiffs have once more placed before the

3

Court the question of the proper nature of the appraisal contemplated under Plaintiffs' policy, and as any appointment of an umpire would presumably initiate the appraisal itself, Nationwide respectfully requests that the Court rule upon the fitness of Plaintiffs' chosen appraiser, Mr. O'Leary. Plaintiffs have not acted to replace Mr. O'Leary with an appropriately "impartial" appraiser, as required under the policy, in spite of Nationwide's formal objection to Plaintiffs' selection of Mr. O'Leary. (*See* Aug. 28, 2009 Letter K. O'Scannlain to N. Gaudet & M. Brown (Ex. 4).) So that the parties may move forward with a valid appraisal that will advance, rather than unduly prolong, the present litigation, Nationwide moves the Court to strike Mr. O'Leary as Plaintiffs' "competent and impartial appraiser."

## ARGUMENT

Pursuant to the terms of the contract and indisputable evidence, Mr. O'Leary lacks capacity to serve as a "competent and impartial appraiser" as a matter of law.

### I. The Appraisal Clause's Impartiality Requirement Sets A High Standard For Appraiser Neutrality.

The express impartiality requirement in the parties' contract should be given full force and effect. The appraisal is fundamentally a creature of contract, and as such is to be conducted pursuant to the terms of the appraisal clause in the parties' contract. In its seminal decision in *Munn*, the Mississippi Supreme Court expressly applied the terms of "[t]he provision in the policy for the appointment of appraisers." *Munn v. National Fire Ins. Co. of Hartford*, 115 So. 2d 54, 55 (Miss. 1959). The Court described appraisal as a process arising from "agreements in, or separate from, contracts," reasoning that "appraisement is an ***agreed method*** of ascertaining value or amount of damage, ***stipulated*** in advance." *Id.* at 55, 56 (quoting *Hartford Fire Ins. Co. v. Jones*, 108 So. 2d 571, 572 (Miss. 1959)). This Court, too, has recognized that "[a]n appraisal provision embedded in a property insurance contract is valid and enforceable in

accordance with its terms." *Kuehn v. State Farm Fire & Cas. Co.*, No. 1:08CV577 LTS-RHW, 2009 WL 2567485, at *7 (S.D. Miss. Aug. 17, 2009).

Under the plain terms of the appraisal clause, the appraisers appointed by each side must be not only "competent," but "impartial." There can be no doubt that, just as parties contracting for appraisal in Mississippi are free to structure the scope and procedures of an appraisal, "parties are free by contract to specify the credentials of party-appointed appraisers." *Rios v. Tri-State Ins. Co.*, 714 So. 2d 547, 549 (Fla. 3d DCA 1998); *see Schipper & Block, Inc. v. Carson Pirie Scott & Co.*, 256 N.E.2d 854, 857 (Ill. App. Ct. 1970) (holding that appraisal provisions in contract, including requirement that appraisers be "disinterested," "were special qualifications contained in the lease and govern the qualifications which the appraisers in this case must possess," and noting that "[w]e are not concerned herein with the general law relating to disqualification of appraisers, but with the special qualifications of the appraisers set forth in the lease"); *In re Astoria Med. Group*, 182 N.E.2d 85, 87 (N.Y. 1962) (court must look to private agreement of parties in disqualifying member of arbitration panel for bias). Here, the parties have unquestionably required that the appraisers selected by the parties be not only "competent," but also "impartial." *Cf. Citizens Prop. Ins. Corp. v. M.A. & F.H. Props., Ltd.*, 948 So. 2d 1017, 1020 (Fla. 3d DCA. 2007) (reasoning, based on *Rios*, that where contract required that parties appoint "competent" appraiser, but did not otherwise limit qualifications, appraiser's "unquestionable personal bias" did not provide grounds to upset appraisal award). Indeed, the clear importance of this clause to the parties' substantive rights merits all the more stringent enforcement of its terms.

The impartiality requirement set forth in the appraisal clause establishes a robust standard that forbids not only any pecuniary interest beyond mere payment for service as an appraiser, but ***any*** connection that raises a substantial possibility of unscientific preference for either party. The starting point for this inquiry is this Court's well-taken observation that "an 'impartial'

5

appraiser … may not be the same as a disinterested one." (Aug. 18, 2009 Order at 2.) In using each of these terms to define the other, Black's Law Dictionary effectively equates impartiality and disinterestedness, while ascribing to the latter a financial connotation. *See* Black's Law Dictionary (8th ed. 2004) (defining "impartial" as "[u]nbiased; disinterested;" defining "disinterested" as "[f]ree from bias, prejudice, or partiality; not having a pecuniary interest"). Grappling with the definition of "disinterested" in an analogous context, the Mississippi Supreme Court associated the term with a lack of partiality or bias, while noting that it carries undertones of pecuniary connections. *See Broadhead v. Bonita Lakes Mall, Ltd. P'ship.*, 702 So. 2d 92, 97 (Miss. 1997) (citing *Hill v. Thompson*, 564 So. 2d 1, 13 (Miss. 1989)). Importantly, the contract contemplates that "[e]ach party will … [p]ay its chosen appraiser." (Nationwide Business Provider Policy, Form BPP-0006 (1-0294) § E.2.a. at NW-2SUN 000102.) The appraisal clause thus makes clear that this particular financial interest does not constitute "impartiality," employing that term, rather than the closely related term "disinterested," to avoid any ambiguity. The best reading of the policy, therefore, is that "pecuniary interest" above and beyond that contemplated by the appraisal clause itself (i.e., payment for service as an appraiser) *does* constitute a lack of impartiality. Importantly, moreover, the association of "impartial" with a lack of bias makes clear that it sets a broad, comprehensive standard of neutrality that goes beyond financial interest alone. Utilizing the Black's Law Dictionary definition of "bias," it is apparent that "unbiased" indicates a lack of "[i]nclination; prejudice; [or] predilection." *See* Black's Law Dictionary (8th ed. 2004). In full context, therefore, the impartiality requirement forbids appointment of an appraiser who possesses relationships—financial or otherwise—that reasonably indicate or suggest—even if they do not demonstrably reach—"[i]nclination; prejudice; [or] predilection."

      While Mr. O'Leary's capacity to serve as an "impartial appraiser" must be judged pursuant to the terms of the party's appraisal agreement, caselaw addressing the customary

6

arbitration standard of "evident partiality"—a standard found in both Section 10 of the Federal Arbitration Act and Section 11-15-133 of the Mississippi Code[2]—makes clear the parties' intent to impose a strong standard of impartiality in this contract. The requirement that the named appraiser be "impartial" plainly establishes a more demanding standard than the "evident partiality" of an arbitrator which renders an arbitral award unenforceable. As the Second Circuit has held in a leading decision "evident partiality" exists where a relationship between an arbitrator and party "is such that reasonable people would have to believe it provides strong evidence of partiality by the arbitrator." *Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 85 (2d Cir. 1984); *see id.* at 84 (reasoning that "evident partiality" connotes a standard somewhere between mere "appearance of bias" and "proof of actual bias," and finding "evident partiality" even absent evidence of "actual bias" where arbitrator's father was president of union involved in arbitrated dispute); *see also Craig v. Barber*, 524 So. 2d 974, 978 (Miss. 1988) (describing "evident partiality" as occurring where, viewed objectively, an arbitrator's state of mind is "reasonably likely to render him unable to proceed impartially in a particular case," and where that person possesses "a preconceived opinion or a predisposition toward a party to the arbitration"); *Hill*, 564 So. 2d at 13 (noting, in holding that appraisers were not "disinterested" as required by contract clause at issue, that "[t]his Court has also held that a mother-in-law is not a 'disinterested person' within a court rule requiring a certificate to be made by a disinterested person") (quoting *Deer Island Fish & Oyster Co. v. First Nat'l Bank of Biloxi*, 159 So. 656, 657 (Miss. 1935)). As the parties chose to adopt a requirement of "impartial[ity]," rather than requiring the substantially higher showing of

---

[2] That the Mississippi statutory adoption of "evident partiality" appears by the terms of the statute to apply only to umpires, and not to party-selected arbitrators, is of no moment in the present dispute, as it is clear from the terms of the appraisal clause that the party-selected appraisers are to be "impartial."

"evident partiality," it is apparent that a substantial "appearance of bias," even should it not rise to the level of "strong evidence of partiality," renders Mr. O'Leary unfit for his appointed role.

## II. MR. O'LEARY FAILS TO MEET THE APPRAISAL CLAUSE'S IMPARTIALITY REQUIREMENT.

Applying the impartiality requirement delineated above to the facts adduced to this point, there is no question that Mr. O'Leary lacks capacity to serve as an "impartial" appraiser in this matter. This conclusion is, moreover, firmly buttressed by relevant caselaw interpreting and applying similar provisions. Even absent discovery aimed at the appraisal process itself, the following grounds—sufficient independently, and overwhelming collectively—mandate his disqualification. *See Schipper & Block*, 256 N.E.2d at 858 ("Many factors may indicate that an appraiser is not disinterested. Even factors which considered individually and standing alone might not indicate interest might combine to do so according to the circumstances of the case."). *First*, and most importantly, Mr. O'Leary has been paid tens of thousands of dollars to support and advance the very claim for which Plaintiffs offer him as a purportedly "impartial" appraiser. *Second*, Mr. O'Leary's status as Plaintiffs' litigation expert itself specifically precludes him from serving as an "impartial" appraiser. *Third*, Mr. O'Leary cannot be "impartial" in light of the fact that he has already formed opinions on the precise subject of the appraisal. *Fourth*, while not necessary to render him incapable of being "impartial," evidence of Mr. O'Leary's actual bias against Nationwide leaves no doubt of his unfitness.

### A. Plaintiffs Have Paid Mr. O'Leary Substantial Sums Of Money To Assist Them In Advancing The Same Claim For Which They Seek To Appoint Him As An "Impartial Appraiser."

Mr. O'Leary has a substantial, ongoing business relationship with Plaintiffs and Plaintiffs' counsel—including, most significantly, a multi-faceted, intimate, and highly lucrative role in advancing the insurance claims Plaintiffs have asserted against Nationwide in this litigation. Simply put, a person who has been paid to work for several years on the development

of a claim, and continues to be paid to support that claim, cannot be deemed sufficiently "impartial" to be permitted to pass judgment of any kind upon that claim. Yet this is precisely what Plaintiffs suggest in nominating Mr. O'Leary as their purportedly "impartial" appraiser.

Over the two-and-a-half years since initially being retained, Mr. O'Leary has, in connection with the claim at issue in this litigation, served Plaintiffs as an insurance claim consultant, a wind appraisal consultant, a forensic engineering consultant, a testifying litigation expert, and now an appraiser. Mr. O'Leary was initially retained by Plaintiffs in May 2007. (Oct. 6, 2009 Deposition of Lewis O'Leary at 76-77 (Ex. 5).) Mr. O'Leary was recommended to Ralph Brockman, one of Plaintiffs' owners, as someone who could perform "consulting services" that would "assist him in resolving [Plaintiffs'] outstanding insurance claim." (*Id.* at 77.) Acting on behalf of Plaintiffs, ***Mr. Brockman hired Mr. O'Leary to help him determine whether "he ha[d] a case regarding substantially more money than what Nationwide had offered him."*** (*Id.* at 80.) In his initial role as a "consultant," Mr. O'Leary was "engaged to review the insurance claims for the [Sunquest] properties." (Nov. 27, 2007 Letter R. Brockman to T. Brandon (Ex. 6).) Mr. O'Leary did not "do[] a forensic examination of the property ... at first," (O'Leary Dep. at 116), and in fact was not initially aware that Plaintiffs intended to designate him as a testifying expert in litigation, but instead set out first to appraise Plaintiffs' wind damage in his role as an insurance claims consultant, (*see id.* at 80-83). In addition to whatever consulting Mr. O'Leary has done to aid Plaintiffs in their quest for "substantially more money than what Nationwide had offered," he professes to have estimated the amount of wind damage Plaintiffs could claim, purports to have performed a "forensic examination" of the property, and compiled an expert litigation report that addresses claims adjustment issues. Most recently, of course, Mr. O'Leary was named as Plaintiffs' appraiser pursuant to this Court's August 18, 2009 Order. In addition, Mr. O'Leary has been retained as a litigation expert by Plaintiffs' counsel in three other Hurricane Katrina matters. (*See id.* at 62-63.)

As one might expect given the wide array of services Mr. O'Leary has performed, Plaintiffs have paid him substantial sums of money for his efforts to advance their claims. In fact, to date, Mr. O'Leary estimates that he has worked between 200 and 500 hours in these varying capacities at a rate of $200 per hour. (*See id.* 202-203.) In other words, at this point in time, before the appraisal has even begun, ***Plaintiffs have already paid Mr. O'Leary as much as $100,000 for his work on the very claim at issue in this lawsuit and prospective appraisal***. (*See id.*) Indeed, the only invoice produced to date indicates that Mr. O'Leary was paid a total of $51,533.87 between August 1, 2008 and October 8, 2009. (*See* Oct. 8, 2009 O'Leary Invoice (Ex. 7).) Mr. O'Leary has handled approximately 75 Hurricane Katrina cases in some capacity, (*see* O'Leary Dep. at 16-17), earning approximately $300,000 to $500,000 in fees, (*see id.* at 75-76). Thus, his work for Plaintiffs on this case alone has totaled a *minimum* of 10.3 percent ($51,533.87 out of $500,000) and as much as 33 percent ($100,000 out of $300,000) of Mr. O'Leary's total Hurricane Katrina income. Mr. O'Leary continues to collect fees for his services in advancing Plaintiffs' claim, at least in his capacity as a litigation expert and appointed role as an appraiser, and possibly in connection with continued consulting services.

Courts addressing the "evident partiality" standard in the arbitration context—which is, as discussed above, clearly a less demanding standard of neutrality—have highlighted the role of pecuniary and other actual professional relationships between the arbitrator and one of the parties in identifying "evident partiality." Notably, the Supreme Court of the United States has found "evident partiality" to exist in analogous yet significantly less compelling circumstances. *See Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145 (1968).[3] As the Fifth

---

[3] While the Court there addressed the arbitrator's, and interested party's, failure to disclose the "evident[ly] partial[]" relationship, which was deemed necessary because the parties were "free to reject the arbitrator or accept him with knowledge of the relationship." *Id.* at 151 (White, J. and Marshall, J., concurring). Here, of course, beyond challenging the appraisal after it is completed—an option that Nationwide reserves but would prefer not to invoke so as to conserve the time and resources of the parties and this Court—Nationwide has no recourse other than to ask
(Continued…)

Circuit has described the factual situation addressed in *Commonwealth Coatings*, "[t]he relationship involved *fees of about $12,000* paid to the arbitrator by the party, extended over a period of four or five years, *ended only one year before the arbitration*, and *even included the rendering of services on the very projects involved in the arbitration before him*." *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278, 285 (5th Cir.), *cert. denied*, 551 U.S. 1114 (2007).[4] In the case at bar, by comparison, the pre-appraisal relationship involves *fees of at least $51,533 and as much as $100,000* paid to Mr. O'Leary by Plaintiffs, extended over a period of approximately two-and-a-half years, is *ongoing even as the appraisal is set to take place*, and likewise "even include[s] the rendering of services on the very projects involved in the [case] before him"—*services that will presumably continue even while the appraisal is itself conducted*. Unlike the situation confronting the Fifth Circuit in *Positive Software*, in which "[t]he relationship ... pale[d] in comparison" to cases finding "evident partiality," Mr. O'Leary's relationship with Plaintiffs amply meets, and in many respects substantially exceeds, other relationships previously deemed to constitute "evident partiality." *See id.* at 284 (citing *Commonwealth Coatings*, 393 U.S. at 146; *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157, 159 (8th Cir. 1995) (striking arbitrator who was senior officer of a company with a substantial ongoing business relationship with party to arbitration); *Schmitz v. Zilveti*, 20 F.3d 1043, 1044 (9th Cir. 1994) (striking arbitrator who worked for law firm that

---

this Court to make a determination of Mr. O'Leary's failure to satisfy the impartiality requirement. While the *Commonwealth Coatings* disposition is not, therefore, directly on point, that Court's analysis of what constitutes "evident partiality" was necessary to its decision and constitutes strong persuasive precedent for the interpretation of the impartiality requirement at issue under the present contract.

[4] The Fifth Circuit held in *Positive Software* that the controlling holding of the Supreme Court in *Commonwealth Coatings* was provided by Justice White's concurring opinion in that case, relying on that determination to hold that "in nondisclosure cases, an award may not be vacated because of a trivial or insubstantial prior relationship between the arbitrator and the parties to the proceeding." *See Positive Software*, 476 F.3d at 282-83. While there has been substantial debate as to the controlling legal standard set forth in *Commonwealth Coatings*, there is no question that the Supreme Court held that the factual circumstances before it constituted "evident partiality."

had substantial ongoing relationship as legal representative of the parent company of party to arbitration, including representation within two years of the arbitration); *Morelite*, 748 F.2d at 81 (striking arbitrator whose father was president of a union that had an interest in the arbitration)).

Mississippi courts have announced standards that similarly make clear that Mr. O'Leary could not satisfy the "evident partiality" standard, let alone the requirement of "impartial[ity]" contained in the contract. The analysis of the United States District Court for the Southern District of New York in *Tinaway v. Merrill Lynch and Co.*, 692 F. Supp. 220 (S.D.N.Y. 1988)—a decision heavily relied upon by the Mississippi Supreme Court in *Herrin v. Milton M. Stewart, Inc.*, 558 So. 2d 863, 865 (Miss. 1990)—is particularly instructive. In concluding that "an arbitrator's general interest in his or her industry is insufficient grounds" for finding "evident partiality," the court emphasized that, in the case before it, "there was no evidence of any direct business or personal relationship between the arbitrators and [the party seeking to enforce the award]." *Tinaway*, 692 F. Supp. at 224, 225. Of course, Mr. O'Leary not only has a direct and ongoing business relationship with Plaintiffs and their counsel, but he has done substantial work on their behalf in this very case. There can be no doubt that Mr. O'Leary not only fails to satisfy the contract's impartiality requirement, but is in fact "evident[ly] partial[]," as he is more than "reasonably likely" to be "unable to proceed impartially in [this] particular case," and clearly possesses both "a preconceived opinion" and "a predisposition toward a party to the [appraisal]." *Craig*, 524 So. 2d at 978.

Under these circumstances, Mr. O'Leary plainly cannot serve as an "impartial" appraiser within any reasonable definition of the term. As Mr. O'Leary himself put it, "[a]n appraiser is supposed to be a third party," (O'Leary Dep. at 57), "independent" and "impartial," (*id.* at 74). Mr. O'Leary can no more meet such a standard than could a close family relative, current business partner, or employee—let alone one who had collected substantial payment for work on the subject of the appraisal itself. *See Morelite*, 748 F.2d at 84-85. The simple and dispositive

fact is that Plaintiffs seek to vest in Mr. O'Leary the authority to value the very loss that he has personally played the primary role in valuing in support of his client's insurance claim.

### B. Mr. O'Leary Cannot Be "Impartial" Because He Is Currently Being Paid To Serve As Plaintiffs' Litigation Expert.

While Mr. O'Leary's significant involvement with Plaintiffs' claim is itself conclusive as to his unfitness to serve as an "impartial appraiser" in this matter, his service as Plaintiffs' expert, standing alone, also precludes his impartiality. Mr. O'Leary has been designated by Plaintiffs as a testifying expert in this litigation and has in turn produced a litigation report to support Plaintiffs' claim that addresses the very same issue for which he has been named an "impartial appraiser." "[O]ngoing litigation work" as an expert, even when conducted only in unrelated cases, "is a direct pecuniary interest which casts considerable doubt on the appraiser's ability to act impartially." *Gebers v. State Farm Gen. Ins. Co.*, 38 Cal. App. 4th 1648, 1652-53 (Dist. Ct. App. 1995) (holding, under "evident partiality" standard, that appraiser's service as expert witness in two unrelated matters while serving on panel of appraisers in insurance dispute was "more than ample" to vacate arbitration award). Mr. O'Leary's three other instances of expert litigation service on behalf of Plaintiffs' counsel thus independently constitute grounds to spoil his impartiality. (*See* O'Leary Dep. at 62-63); *Britz, Inc. v. Alfa-Laval Food & Dairy Co.*, 34 Cal. App. 4th 1085, 1102-1104 (Dist. Ct. App. 1995) (vacating award for lack of impartiality where arbitrator had previously served as expert witness for law firm jointly representing party to arbitration). Particularly given that Mr. O'Leary has been designated as an expert in the very case for which he has been named an appraiser, his service as a litigation expert precludes him from being deemed "impartial."

As is unsurprising in light of his central role in the advancement and support of Plaintiffs' claim, moreover, substantial evidence exists to indicate that Mr. O'Leary has had deep, partisan involvement in developing Plaintiffs' strategy and positions on their claim both before and

during litigation. As already emphasized, Mr. O'Leary was initially retained after "the buyers recommended [him] to Mr. Brockman as someone that may be able to assist him in resolving his outstanding insurance claim." (O'Leary Dep. at 77.) He was hired to help Mr. Brockman determine whether "he ha[d] a case regarding substantially more money than what Nationwide had offered him." (*Id.* at 80.) Indications exist that, even after being designated as an expert litigation witness and "impartial" appraiser, Mr. O'Leary has continued to view Plaintiffs' claim from a partisan, strategic vantage. He collaborated with Plaintiffs' expert meteorologist in determining what "position" to take regarding wind speed in their respective reports: "[P]rivately, we talked in the range of about 114 [miles per hour], but for the sake of the report, we are just taking the position of over 110." (*Id.* at 158.) Mr. O'Leary likewise engaged several outside consultants to help him not only with his own litigation report but also to combat Nationwide's designated litigation experts. (*See* Oct. 4, 2009 Email L. O'Leary to Todd Skinner (requesting a "nickel's worth of input before [his] Tuesday Depo" and asking Mr. Skinner to comment on "the sample Nationwide estimates" "as to whether or not they remain faithful to the Xactimate recommended numbers or not," which "might aid in putting a chink in this expert they are using's [sic] armor") (Ex. 8); June 25, 2009 Email L. O'Leary to T. Moran and N. Hall (seeking review and comments of his litigation report) (Ex. 9).)

That Mr. O'Leary has played a strategic advisory role with respect to Plaintiffs' claim in this case is supported by startling correspondence he has had with the plaintiff in another Katrina matter before this Court, *Kuehn v. State Farm*, No. 1:08cv577-LTS-RHW, 2009 WL 2567485 (S.D. Miss. Aug. 17, 2009). (*See* Jan. 15. 2006 Email L. O'Leary to H. Kuehn at 1 (discussing "the package we need to use to prevail with," trumpeting the fact that "I am generating large settlements," and sharing his "thoughts on how to proceed," including advising that "[w]e demand appraisal on the wind loss," suggesting that "we never pass up a chance to create even more of an edge wherever possible," describing Mr. O'Leary's strategy for "a series of

14

credibility 'dings' I will put in my counterpart's armour [sic]" so as to "hurt him in the umpire's eyes" as the "ticket we need for success," and recommending the compilation of "an intimidating document" listing contents to increase "the extra amount of dollars won") (Ex. 10).) Such a strategic advisory relationship with the party nominating him as an "impartial" appraiser further confirms Mr. O'Leary's inability to meet that standard. *See* 15 Couch on Insurance, § 211:34 (reasoning that, "where an arbitrator has an acquaintanceship with one of the parties and actively advises that party on strategy, a line is crossed," and describing holding that "ex parte meetings with the opponent at its headquarters to discuss the merits of its defenses and to examine potential documentary evidence in the case prior to the selection of the arbitration panel … provided a reasonable basis for a claim of evident partiality") (citing *Metropolitan Prop. & Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co.*, 780 F. Supp. 885 (D. Conn. 1991).

  C. **Mr. O'Leary's Impartiality Has Been Tainted Because He Has Already Formed Opinions In A Partisan Setting And Without Critical Information.**

  Similarly, even absent any other showing to support his "impartiality," Mr. O'Leary must be precluded from serving as an "impartial appraiser" because he has already reached a formal, written opinion regarding the subject matter of the appraisal—and, moreover, has done so from the perspective of a consultant hired by Plaintiffs and based on incomplete, one-sided information. In his role as a consultant and litigating expert for Plaintiffs, Mr. O'Leary has inspected the property at issue in this dispute a total of five or six times since first visiting the property before being retained in March 2007. (*See* O'Leary Dep. at 78.) In addition to providing Plaintiffs with "initial estimates … in terms of what [he] felt like the damages were" in correspondence with Plaintiffs' agents, (*id.* at 83-84), he has compiled and submitted an expert report setting forth his estimate of "what portion of the damages should have been written up as wind and why," (*see* June 29, 2009 Report of Findings at 1 (Ex. 11)). All of this took place, of course, prior to the pending appraisal. Plainly, Mr. O'Leary has previously "formed and

15

expressed an opinion as to the probable values of the [property], or amounts which [the plaintiffs] might receive out of an appraisal proceeding." *Scott v. Arden Farms Co.*, 28 A.2d 81, 86 (Del. Ch. 1942). His "advice was rendered in a professional capacity, and for compensation." *Id.* As such, even absent any proof that Mr. O'Leary "would necessarily act unfairly in appraising the [property]," "the risk that his judgment might be influenced, consciously or subconsciously, by his previous conclusions and recommendations, or by a tendency to attempt to justify them, is such that he should not be expected to act with the freedom of mind required. In consequence, he is not a 'disinterested' person." *Id.*; *see Schipper & Block, Inc. v. Carson Pirie Scott & Co.,* 256 N.E.2d 854, 857 (Ill. App. Ct. 1970) (vacating appraisal award where appraiser was not "disinterested" because he had "by his prior appraisal of the property for tax purposes prejudged the value of the property" by "form[ing] a conclusion as to the value thereof prior to his appointment as an appraiser"); *Craig*, 524 So. 2d at 978 ("Evident partiality of an arbitrator as a defense to an award is analogous to attacks upon a judge on grounds of partiality. A request that a judge recuse himself is based upon an inquiry into whether he has sufficient connections with parties or preconceived opinions regarding a case that he could not fulfill the role of judge in deciding it."); *Produce Refrigerator Co. v. Norwich Union Fire Ins. Soc.*, 97 N.W. 875, 876 (reasoning that compulsory nature of arbitration at issue made it "highly important that the men selected should in every sense be disinterested" and that requirement of disinterest could not be met where the proffered arbitrator "had formed an opinion or is otherwise prejudiced in respect to the subject-matter"), *aff'd,* 98 N.W. 100 (Min. 1904).

The concern animating the preclusion of appraisers who have preconceived opinions is readily confirmed in this case by the fact that Mr. O'Leary has, by his own admission, reached his pre-appraisal opinions—on the very issue to be addressed in the appraisal—without the benefit of a large amount of critical information. Despite emphasizing the importance of photographic evidence since he did not inspect the property before repairs were conducted, (*see*

16

O'Leary Dep. at 79-80, 136-37), Mr. O'Leary formed his opinions without seeing hundreds of photographs taken by Nationwide adjusters during an October 2005 inspection of the property, (*see id.* at 8-9, 123). It is worth noting in this respect that, where he lacked photographs or specific individual recollection regarding items of damage, Mr. O'Leary testified that he employed a strategy of "taking a leap of faith and making the best guess possible." (*Id.* at 140.) Further, despite the fact that it was present in Plaintiffs' files right alongside the estimates of their public adjusters, Mr. O'Leary was not even aware of the existence of the engineering report procured by Nationwide in assessing Plaintiffs' claim until the day before his recent deposition. (*See id*. at 10.) That he lacked this information, through no fault of Nationwide, when he reached not only "initial estimates," but in fact a full estimate of "what portion of the damages should have been written up as wind and why," (*see* June 29, 2009 Report of Findings at 1), only further confirms his unfitness to serve as an "impartial appraiser."[5]

### D. Evidence Suggests That Mr. O'Leary Harbors Actual Bias Against Nationwide And Other Insurance Carriers.

Although, as established above, specific evidence of "actual bias" is unnecessary to demonstrate a failure of impartiality, the presence of evidence indicating that Mr. O'Leary would approach the appraisal as a partisan conclusively confirms the unfitness demonstrated above. There is substantial evidence on the record that Mr. O'Leary would conduct the appraisal with not only the disqualifying preference for Plaintiffs discussed above, but also an untoward

---

[5]   Mr. O'Leary's opinions are not "balanced" not only because he failed to consider a substantial amount of material produced by Nationwide in reaching his opinion, but because he heavily relied on interested persons in securing and interpreting the information he did utilize. His attempt to explain this away by claiming that "most of [the] input that [he] received on what was and was not damaged was from people that don't work for Ralph Brockman," and who thus purportedly "ha[d] no dog in this hunt," rings hollow upon closer examination of those sources. (O'Leary Dep. at 57.) Tammy Crossley, to whom Mr. O'Leary paid approximately $5,000, is a public adjuster with an "ongoing relationship" with the buyers of the Sunquest property. (*Id.* at 116, 187.) Moreover, although she ultimately was not chosen to "represent" Plaintiffs for their claim, she was initially brought into the project by Mr. Brockman to consult regarding the value of Plaintiffs' claim. (*Id.* at 57.) Similarly, Donna Bass was employed by Plaintiffs prior to, during, and after Hurricane Katrina as the manager of the Carriage House and Compass Pointe properties. (*See id.*)

predisposition against Nationwide. In his own words, Mr. O'Leary "jumped the fence about 15 years ago" and began "functioning largely for the consumers." (O'Leary Dep. at 239-40.) In fact, of the 75 Hurricane Katrina cases in which Mr. O'Leary has been retained in some capacity, all of his work has been on the property owner side of this perceived "fence." (*Id.* at 20-21.) Of his current portfolio of cases, he estimates that 97 or 98 percent are on behalf of property owners. (*Id.* at 47.) Mr. O'Leary asserts that of all of the "disputes between property owners and their insurance carriers," "[i]n excess of 80 percent" are the result of four categories of error or oversight on behalf of the adjuster and/or carrier. (*Id.* at 67-71.) According to Mr. O'Leary, other categories of insurer error further increase that percentage. (*See id.* at 72-73). Indeed, despite purportedly conducting a searching and independent review of the public adjuster estimate procured by Plaintiffs to argue for increased coverage to Nationwide, Mr. O'Leary made no reductions or causation modifications to that report—instead making only extensive additions and enhancements. (*See id.* at 156 ("Q. … So would it be fair to say all of the changes in your report from the World Claim and Nationwide estimates are either adding items, enlarging the scope of items or increasing the price of items? A. That pretty well describes it, I believe.").)

## CONCLUSION

While Plaintiffs will no doubt point to Mr. O'Leary's self-serving claim to be "fiercely independent," the record belies such assertions. Under any reasonable interpretation of Plaintiffs' insurance policy, Mr. O'Leary is incapable of serving as an "impartial appraiser" after spending several years, and earning tens of thousands of dollars, developing and advancing the very claim that this appraisal will address. Nationwide respectfully requests that this Court act now to strike Mr. O'Leary as Plaintiffs' appraiser and direct Plaintiffs to select a duly "impartial" candidate, prior to the selection or appointment of an umpire or the initiation of any other steps in the contractually defined appraisal process, so that the parties may move forward with a valid appraisal that will advance, rather than unduly prolong, the present litigation.

THIS, the 22nd day of October, 2009.

                      Respectfully submitted,

                      NATIONWIDE PROPERTY & CASUALTY
                      INSURANCE COMPANY, DEFENDANT

                      By Its Attorneys
                      WATKINS LUDLAM WINTER & STENNIS, P.A.

                      By:   /s/ Laura L. Hill
                            LAURA L. HILL
                            lhill@watkinsludlam.com

H. Mitchell Cowan (MSB No.7734)
Laura Limerick Gibbes (MSB No. 8905)
F. Hall Bailey (MSB No. 1688)
Janet D. McMurtray (MSB No. 2774)
Christopher R. Shaw (MSB No. 100393)
Laura L. Hill (MSB No. 102247)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, MS 39205
Telephone: (601) 949-4900
Facsimile: (601) 949-4804

Of Counsel:
Daniel F. Attridge, P.C. (Bar No. 44644)
Christian D.H. Schultz (Bar No. 44747)
Kate S. O'Scannlain (Bar No. 45034)
Robert B. Gilmore (Bar No. 44997)
Kenneth S. Clark (Bar No. 44718)
Jeffrey A. Todd (Bar No. 45916)
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Suite 1200
Washington, DC 20005
Tel: (202) 879-5000
Fax: (202) 879-5200

**CERTIFICATE OF SERVICE**

    I certify that I have this day electronically filed the foregoing using the Court's ECF system, which sent electronic notification of such filing to:

>Nathan M. Gaudet
>Matthew K. Brown
>SULLIVAN, STOLIER AND RESOR, APLC
>909 Poydras Street, Suite 2600
>New Orleans , LA 70112
>504/561-1044
>Fax: 504/561-8606
>ngaudet@ssrlawfirm.com
>mbrown@ssrlawfirm.com

This the 22nd day of October, 2009.

                        By:    /s/ Laura L. Hill
                               LAURA L. HILL
                               lhill@watkinsludlam.com