**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**SUNQUEST PROPERTIES, INC. and**
**COMPASS POINTE APARTMENTS**
**PARTNERSHIP,**                                                                              **PLAINTIFFS**

**v.**                                                              **Civil Action No. 1:08-CV-692-LTS-RHW**

**NATIONWIDE PROPERTY AND**
**CASUALTY INSURANCE COMPANY**
**and JOHN DOES 1-5,**                                                                          **DEFENDANTS**

**MEMORANDUM IN SUPPORT OF NATIONWIDE'S MOTION TO STRIKE**
**LEWIS O'LEARY AS PLAINTIFFS' LITIGATION EXPERT**

Nationwide submits this Memorandum in support of its motion to strike Plaintiffs' designated expert, Lewis O'Leary, from serving as an expert in this action. First, Mr. O'Leary should be stricken because his opinions require substantial engineering knowledge, yet he is not an engineer — let alone an engineer licensed in Mississippi. Second, Mr. O'Leary's financial and strategic relationship with Plaintiffs — including an invalid contingency fee agreement that was operative when he did all of his work in this matter, a mid-litigation attempt to shroud the existence of and retroactively modify that contingency agreement, and continued payments for purported work on creating new estimates that Mr. O'Leary's own estimator claims to have done exclusively by himself — violates long-standing tenets of independence for litigation experts, and requires that he be precluded from serving as an expert witness.[1] Third, the demonstrable

---

[1] Nationwide is mindful of the fact that the Court denied its motion to strike Mr. O'Leary as Plaintiffs' "impartial appraiser." (*See* Dec. 11, 2009 Mem. Op. & Order [Dkts. 168 & 169].) However, Plaintiffs' production of documents that they had previously withheld, and only produced after the close of discovery in the *Carriage House* matter, after Nationwide had moved to compel, revealed substantial new information regarding Mr. O'Leary's compensation, as detailed herein and in Nationwide's Motion for Reconsideration of Order. (*See* Dec. 17, 2009 Mot. for Recons. of Order Den. Nationwide's Mot. To Strike Pls.' Designation of Lewis O'Leary as Their Appraiser [Dkt. 170].) Given this new information, Nationwide has moved for the Court to reconsider its order regarding Mr. O'Leary's fitness to serve as an appraiser. Based on the same previously withheld information, Mr. O'Leary is unfit to serve as an expert at trial.

unreliability of Mr. O'Leary's opinions not only reflects his lack of expert qualifications, but

constitutes its own independent ground for the preclusion of his opinion from this matter.

> **A.    BECAUSE MR. O'LEARY IS NOT A LICENSED PROFESSIONAL ENGINEER, HE IS NOT COMPETENT TO PRESENT TESTIMONY REQUIRING SUBSTANTIAL ENGINEERING KNOWLEDGE.**

Mr. O'Leary must be precluded from presenting testimony that requires substantial

engineering knowledge because he is not a licensed professional engineer.  In *Bossier v. State*

*Farm Fire and Casualty Co.*, this Court ruled unequivocally that an individual not licensed as a

professional engineer in Mississippi is not competent to testify as an expert witness to issues of

causation or other determinations requiring "substantial engineering knowledge."  *Bossier v.*

*State Farm Fire & Cas. Co.*, No. 1:08CV408-LTS-RHW, 2009 WL 4061501, at *6 (S.D. Miss.

Nov. 20, 2009) (Senter, J.).  The Court applied Federal Rule of Evidence 601, which provides

that in cases where state law supplies the rule of decision, state law governing the competency of

witnesses applies.  *See id.* at *1 (citing Fed. R. Evid. 601).  The Court then looked to Section 73-

13-1 of the Mississippi Code, which states in relevant part:

> [i]n order to safeguard life, health, and property, and to promote the public welfare, any person or firm in either public or private capacity practicing or offering to practice engineering shall hereafter be required to submit evidence that the person or firm is qualified so to practice engineering and shall be licensed as hereinafter provided; and ***it shall be unlawful for any person or firm to practice or to offer to practice in this state, engineering, as defined in the provisions of Sections 73-13-1 through 73-13-45***, or to use in connection with his name or otherwise assume, use, or advertise any title or description tending to convey the impression that he is a professional engineer***, unless such person has been duly licensed under the provisions of Sections 73-13-1 through 73-13-45.***

Miss. Code Ann. § 73-13-1.[2]  Given that Section 73-13-3 of the Mississippi Code defines "the practice of engineering" to include, *inter alia*, "expert technical testimony evaluation," the Court concluded that "testifying as an expert in the field of engineering is within the definition of 'practicing engineering' and therefore requires a Mississippi certificate of registration." *Bossier*, 2009 WL 4061501, at \*1-2 (citing Miss. Code. Ann. § 73-13-3).  As the Court recognized, Mississippi even has relaxed the requirement that persons who seek to testify as an engineer be licensed in Mississippi, allowing for them to obtain a "Limited Licensure for Expert Technical Testimony" so long as they are licensed in another state.  *See id.* at \*2-\*3 (citing Mississippi Bd. of Licensure for Prof'l Eng'rs & Surveyors R. 4.05).  In *Bossier*, however, the insurance carrier's proffered engineering expert was not licensed as a professional engineer in any state.  This Court found that because under "Rule 601 … Mississippi law governs the competency of [the witness] to testify as an expert in the field of engineering" the witness's "lack of the certification required by Miss. Code Ann. §73-13-1 *et seq.* and the regulations thereunder disqualify him from giving expert testimony concerning engineering issues in this case." *Id.* at \*6.

The *Bossier* decision follows this Court's earlier decision in *Aiken v. Rimkus Consulting Group, Inc.* to preclude a witness who was not a licensed engineer from providing engineering opinions at trial, for the same reasons articulated in *Bossier* — a result which the Fifth Circuit affirmed earlier this year.  *See Aiken v. Rimkus Consulting Group Inc.*, 333 F. App'x 806, 813 (5th Cir. 2009) (affirming *in limine* order which did not permit property owner's witness from offering engineering testimony "on the basis of Mississippi statutes permitting only licensed Mississippi engineers to provide expert evaluations of other engineers' work." *See*

---

[2] Emphasis added unless otherwise noted.

Miss. Code Ann. §§ 73-13-1 *et seq.*").[3]  And the Court's decisions are also consistent with those

reached by numerous other federal courts faced with the same issue of whether a proposed expert

witness is competent under state law.[4]

The Court should reach the same result here as it did in *Bossier* and *Aiken*.  Like *Bossier*,

this action is predicated on diversity jurisdiction, and Plaintiffs' claims are governed by

Mississippi state law.  Therefore, Mississippi state law also supplies the rules for competency of

witnesses, pursuant to Rule of Evidence 601.  It is undisputed that Mr. O'Leary is not a licensed

professional engineer, in Mississippi or any other state. (*See* Oct. 6, 2009 Deposition of Lewis

O'Leary, *Carriage House*,[5] at 29 ("Q. Do you have a professional engineering license? A. No, I

do not.") (Ex. 1).)  Accordingly, under Mississippi law, as this Court found in *Bossier* and in

*Aiken* (a ruling affirmed by the Court of Appeals), Plaintiffs' unlicensed "expert" witness must

be precluded from offering any engineering expert testimony in this action.  Because such

testimony is reserved to licensed engineers, Mr. O'Leary should not be permitted to offer

---

[3]  It bears mention that the Fifth Circuit's decision affirming this Court's ruling in *Aiken* was published on May 26, 2009, a full month before Plaintiffs designated Mr. O'Leary as their expert and disclosed his report in which he purported to offer engineering opinions.  Thus, in light of the *Aiken* decisions, Plaintiffs cannot claim to have been surprised by this Court's decision in *Bossier*; and given that the Court did not grant State Farm leave to designate a new engineering expert once its witness had been disqualified, there is no reason to grant Plaintiffs here such an indulgence.

[4]  *See*, *e.g.*, *McDowell v. Brown*, 392 F.3d 1283, 1295 (11th Cir. 2004) (state law must be applied in determining whether a witness is competent before assessing whether a witness is qualified under Fed. R. Evid. 702); *Legg v. Chopra*, 286 F.3d 286, 290-92 (6th Cir. 2002) (under Rule 601, state statute requiring that a medical professional seeking to testify as an expert be licensed by that state or a contiguous state had to be applied in assessing the competency of a potential witness in a diversity case); *Rosenfeld v. Basquiat*, 78 F.3d 84, 89-90 (2d Cir. 1996) (state competency statutes apply where substantive claim is based on state law); *Higgenbottom v. Noreen*, 586 F.2d 719, 722 (9th Cir. 1978) (same); *Miville v. Abington Memorial Hosp.*, 377 F. Supp. 2d 488, 492-93, 495 (E.D. Penn. 2005) (same); *Barton v. American Red Cross*, 829 F. Supp. 1290, 1299 (M.D. Ala. 1993) (same), *aff'd*, 43 F.3d 678 (11th Cir. 1994); *Ralph by Ralph v. Nagy*, 749 F. Supp. 169, 172-73 (M.D. Tenn. 1990) (same).

[5]  To assist the Court, the following designations will apply for the record citations: "*Carriage House*" will refer to *Sunquest Properties, Inc. & Carriage House Apartments Partnership v. Nationwide Prop. & Casualty Ins. Co.*, 1:08-CV-687-LTS-RHW, and "*Compass Pointe*" will refer to the instant case, *Sunquest Properties, Inc. & Compass Pointe Apartments Partnership v. Nationwide Prop. and Cas. Ins. Co.*, 1:08-CV-692-LTS-RHW.

opinions or analysis concerning what elements of Plaintiffs' property were or were not damaged, or regarding the cause (wind, storm surge, or Plaintiffs' lack of mitigation) of such damage.

Plaintiffs' misguided belief that a letter from the Mississippi Board of Licensure for Professional Engineers & Surveyors somehow changes this result is readily dismissed. To begin, Plaintiffs grossly mischaracterize the letter, which in no way "found that Mr. O'Leary is not practicing engineering when he addresses issues of causation." (Jan. 12, 2010 Memo. in Opp. to Nationwide's Mot. to Strike Lewis O'Leary as Pls.' Litigation Expert, *Carriage House*, at 6 [Dkt. 235].) In fact, the letter merely stated that Mr. O'Leary's "explanation [was] satisfactory." (Feb. 28, 2008 Letter R. Brister to L. O'Leary (Ex. 2).) As Mr. O'Leary himself explained, the report at issue there was not an engineering report because it was developed for purposes of appraisal, in Mr. O'Leary's capacity as an appointed appraiser. (*See* Jan. 25, 2008 Letter L. O'Leary to R. Brister (Ex. 3).) To the extent the Board found anything entitled to deference from this Court, it is merely that ***appraisers***, as opposed to ***litigation experts in causation***, need not be engineers—a proposition that Nationwide does not contest. (*See id.* (arguing that "[c]ommonly, engineers, contractors, adjusters, and attorneys are picked to serve as Appraisers" and that appraisal is an "informal process, requiring no special license or credentials").) Plaintiffs also misapprehend this Court's holding in *Bossier*, attributing to it a non-existent and nonsensical distinction between "causation" reports such as Mr. O'Leary's and "engineering" reports such as that purportedly at issue in *Bossier*. (*See* Memo. in Opp. to Nationwide Mot. to Strike Lewis O'Leary, *Carriage House*, at 6-7.) This Court left no doubt that expert litigation reports and testimony addressing wind/water causation, or making any other determinations requiring "substantial engineering knowledge," may only be offered by a Mississippi-licensed engineer:

5

This is a diversity action in which the substantive law of Mississippi applies. The central issue in this action is whether the storm damage to the insured property, real and personal, was caused by wind (a covered loss within the policy's named peril, windstorm) or by storm surge flooding (a loss from an excluded peril). Masters has been called to the stand to testify on this issue and to express the opinion reflected in his report, i.e. his opinion that the property damage in this instance was caused by storm surge flooding and not by wind. **This issue requires that substantial engineering knowledge be brought to bear concerning the insured structure and the forces generated by the storm.**

*Bossier*, 2009 WL 4061501, at *6.

### B. MR. O'LEARY'S FINANCIAL DEALINGS WITH PLAINTIFFS SHOULD PRECLUDE HIM FROM SERVING AS A LITIGATION EXPERT.

Leaving no doubt on the subject, Mr. O'Leary, Sunquest representative Ralph Brockman, and Plaintiffs themselves, in pleadings to this Court, have now expressly admitted the falsity of their prior testimony and Plaintiffs' prior representations to the Court, acknowledging that ***Mr. O'Leary was operating under a contingency fee arrangement at the time that he created his estimates and expert report***. (*See* Jan. 19, 2010 Deposition of Ralph Brockman, *Compass Pointe*, at 37, 40 (explaining that Mr. O'Leary operated under contract entitling him to 4% of Plaintiffs' claim until purportedly superseded by mid-litigation September 22, 2009 agreement) (Ex. 4); Jan. 15, 2010 Deposition of Lewis O'Leary, *Compass Pointe*, at 240 (discussing contract terms) ("Q. And four percent of whatever the final award is, whether it's $1,000,000, $5,000,000, $10,000,000 or $20,000,000; correct?  A. Yes.") (Ex. 5); *id.* at 222 ("Q. [T]he arrangement was there will be $75,000 now, and if a $10,000,000 award comes in, it would be another $225,000, if it was $10,000,000; right?  A. (WITNESS NODS HEAD UP AND DOWN.)  Q. If it was $20,000,000, it would be $450,000 more; correct?  A. Uh-huh.  Q. … And if it was less than $10,000,000, that remaining number would -- would go down?  A. Yes."); *id.* at 245 (***"During that particular period of time there was a percentage agreement."***).); *id.* at 237-38 ("Q. And this represents the agreement that you had in place up until the lawyers told you

you can't have this agreement; is that right?  A. That's right.  Q. And that took place sometime last fall, correct?  A. I think so.  Q. By 'last fall,' I mean September of 2009; correct?  A. That sounds about right."); Jan. 28, 2010 Surrebuttal in Opp. to Nationwide's Mot. to Strike Lewis O'Leary as Pls.' Litigation Expert, *Carriage House*, at 3 (admitting that retention agreement in place during creation of estimates and expert report was "contingency percentage arrangement") [Dkt. 242-2].)

Once more seeking to evade the inevitable effects of this admittedly impermissible arrangement, Plaintiffs now misleadingly assert that Mr. O'Leary's new, hourly agreement was entered into "when [O'Leary] was engaged to serve as appraiser and expert."[6]  (Surrebuttal in Opp. to Mot. to Strike O'Leary, *Carriage House*, at 2.)  Yet the September 23, 2009 agreement was only entered into after Plaintiffs' counsel *"realized" Mr. O'Leary's contingency arrangement "was not legal," over two months after Mr. O'Leary's expert report and estimates were completed*.  (O'Leary Dep., *Compass Pointe*, at 255.)  Contrary to Plaintiffs' assertions, Mr. O'Leary was "engaged" to serve as Plaintiffs' expert long before Plaintiffs' counsel, in Mr. O'Leary's words, *"actually redid the contract" in the middle of litigation "to keep [Plaintiffs and Mr. O'Leary] out of trouble."*  (O'Leary Dep., *Compass Pointe*, at 238.)

Plaintiffs effectively ask this Court to permit contingent payments to be made through the back door by purporting to retroactively convert an entitlement to a percentage of the recovery into a capped hourly agreement — even after they had performed under the contingent

---

6    The still-growing list of Plaintiffs' outright misrepresentations and grossly distortive or misleading representations thus only continues to grow.  Related, prior examples include the following: On July 17, 2009 — while the contingency fee agreement was still unquestionably in effect — *Plaintiffs misrepresented to this Court that "Mr. O'Leary has no stake in the outcome of this matter."*  (July 17, 2009 Memo. in Reply to Def.'s Resp. in Opp. to Pls.' Mot. for Appraisal of the Entire Loss or, in the Alternative, for a New Trial, *Compass Pointe,* at 5 [Dkt 44].)  On September 22, 2009, the very same date that the "re-do" agreement was entered, *Plaintiffs' counsel misrepresented to counsel for Nationwide that "all responsive documents relating to this Hurricane Katrina claim in Mr. Brockman's possession have been produced."*  (Sept. 22, 2009 Letter N. Gaudet to L. Hill (Ex. 6).)

agreement. Indeed, ***Mr. O'Leary not only reached his opinion and crafted his estimates in this matter under the incentive of a contingent recovery, but has been paid "advances" on his final contingency fee payment***. Contrary to Mr. O'Leary's report, (*see* June 29, 2009 ProBuilders Report of Findings at 6 (Ex. 7)), and to Plaintiffs' persistent claims that Mr. O'Leary "was always paid by the hour," (Dec. 16, 2009 Memo. in Opp. to Mot. for Sanctions, *Carriage House*, at 4 [Dkt. 226]), ***Mr. O'Leary has been issued multiple "milestone" payments as an "advance" on his entitlement to 4% of Plaintiffs' claim***. (*Compare* O'Leary Dep., *Compass Pointe,* at 246-47; *id.* at 251-52 ("Q. This invoice, that we're looking at here, does not show any kind of hourly component? A. That -- that is correct. It does not. You're absolutely right."); *with* Memo. in Opp. to Mot. to Strike Lewis O'Leary as Litigation Expert, *Carriage House,* at 2 (misrepresenting that all payments to Mr. O'Leary have been "based on Mr. O'Leary's contract price of $200 per hour").)

Neither is there any evidence that Mr. O'Leary has done any of the work on the estimates that he has been paid for, whether under his contingency agreement or the September 22, 2009 agreement. While the amount of Mr. O'Leary's full payment has been a moving target throughout this litigation, the most recent tabulation provided by Plaintiffs shows that, as of December 21, 2009, Mr. O'Leary had been paid $140,917.83 for his work in this matter as Plaintiffs' hybrid claims consultant/public adjuster/appraiser/litigation expert. (*See* Payments to Lewis O'Leary (Ex. 8).) In addition to receiving tens of thousands of dollars for performing an array of strategic services in developing and advancing Plaintiffs' claim, Mr. O'Leary drew tens of thousands of dollars from his entitlement to a $75,000 advance on his contingency fee for progress in developing estimates. (*See, e.g.*, *id.* (listing "requests" for "Phase II" of $10,000, $12,500, and $9,525).) Yet as Mr. O'Leary's consultant Jerry Wiggins has testified, he

8

personally completed the estimates, which Mr. O'Leary subsequently adopted, with ***no input or***

***contribution from O'Leary*** other than the instruction to rely on the causation and scope

determinations made by Plaintiffs' public adjuster, WorldClaim. (*See* Nov. 4, 2009 Deposition

of Jerry Wiggins, *Carriage House*, at 176 ("Q. The meeting that you had with Mr. O'Leary, the

determination made by you and him was that the WorldClaim estimate would be the basis for

your estimate; is that correct?  A. Right.  Q. Beyond that, did you have any conversation with

Mr. O'Leary regarding the items that you added to the WorldClaim estimate?  A. I don't recall

discussing that with him.  That was my job.") (Ex. 9); Jan. 26, 2010 Deposition of Jerry Wiggins,

*Compass Pointe*, at 70 (Q. … [O]ther than that initial meeting with Mr. O'Leary, you never

discussed, in substance, the scope of damages that you were writing?  A. No.") (Ex. 10); *id.* at 72

("Q. And did Mr. O'Leary provide you any comments or feedback that -- A. Not a word."); *id.* at

73-74 (similar).)  In complete contradiction to Mr. Wiggins's testimony, Mr. O'Leary testified

that he had "[a]t least 40 if not 60" conversations with Mr. Wiggins regarding the production of

the estimates.  (O'Leary Dep., *Carriage House*, at 146.)  This is just one of numerous glaring

inconsistencies between Mr. Wiggins's testimony that he did all the estimating work on his own,

and Mr. O'Leary's claims to have controlled the process.[7]

Similarly, between his October 6, 2009 deposition and the end of 2009, Mr. O'Leary has

received tens of thousands of dollars in "hourly" payments based on invoices he sent to Plaintiffs

---

[7]    (*Compare* Wiggins Dep., *Carriage House*, at 202 ("Q. And it was, ultimately, your decision whether or not to
include a given item in this estimate, correct?  A. Yes.  Well, in the WorldClaim.  Q. Right.  Other than --
putting aside the WorldClaim numbers, which you used as a basis?  A. Right."), *with* O'Leary Dep., *Carriage
House*, at 136-37 ("Q. Who is deciding how a blank was going to be filled in?  Was that -- A. That was my job.
… Q. And then Mr. Wiggins, what was his role, simply to input the figure in the Xactimate system?  A. Yes,
sir."); *compare* Wiggins Dep., *Carriage House*, at 208-209 ("Q. Did you, at any point, take one of the
WorldClaim building estimates and mark up that estimate, use it as a basis for your Xactimate entries?  A. No,
sir."), *with* O'Leary Dep., *Carriage House*, at 153 ("A. We took a World Claim's estimate -- … -- and marked
the heck out of it. … Q. When you say you took the World Claim estimate and marked it up, you literally took a
hard copy and with a pen -- A. Yes, sir.  Q. -- wrote changes on it?  A. Yes, sir.").)

for 87.2 hours of work that he purports to have done in developing revised estimates with Mr. Wiggins.  (*See* ProBuilders Invoices Nos. 15 & 16 (documenting, for example, 10.1 hours for "[w]ork with J Wiggins on Carriage House estimates for Buildings 3 & 4"; 32 hours for "[c]ontinue to overhaul Carriage House estimates"; 23 hours for "[m]ultiple exchanges with Jerry regarding Compass Pointe revisions and Nationwide estimates") (Ex. 11).)  Yet as Mr. Wiggins further testified, and as documents that he has produced validate, he has done all of the work on these estimates, with literally no input from or participation by Mr. O'Leary.  (*See* Wiggins Dep., *Compass Pointe*, at 67 (discussing newly produced estimates in Carriage House and Compass Pointe matters) ("Q. And you haven't discussed any of those four estimates with Mr. O'Leary in any substance?  A. Nope.  I'm sorry, no."); *id.* at 92 ("Q. And to your knowledge, Mr. O'Leary hasn't done any work in actually creating the estimates, right?  A. Not my estimates.  *Q. Do you have any knowledge of him doing any work in relation to any estimates for Carriage House or Compass Pointe over the last two months?  A. Not that I'm aware of.*").)  Despite Mr. O'Leary's apparent attempts to influence Mr. Wiggins's recollection after his original deposition testimony, Mr. Wiggins has consistently affirmed this testimony: "He also said that we discussed the project but, other than the initial meeting on the World Claim estimate, I have no recall."  (Nov. 18, 2009 Email J. Wiggins to N. Gaudet (Ex. 12).)

Mr. O'Leary's contingency fee arrangement and continued financial entanglements with Plaintiffs constitute grounds for the Court finding him unfit to serve as a litigation expert in any capacity.  "The majority rule in this country is that an expert witness may not collect compensation which by agreement was contingent on the outcome of a controversy.  That rule was adopted precisely to avoid even potential bias."  *Crowe v. Bolduc*, 334 F.3d 124, 132 (1st Cir. 2003); *see Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002)

("To the extent that AFS employees, as experts … planned to testify regarding the allegations in this litigation, AFS was offering expert testimony for a contingent fee.  Such an arrangement would also violate public policy ….").  In a number of instances, courts have struck experts once it is shown that they are working on contingency and, thus, not financially disinterested from the outcome of the litigation in which they are supposed to be offering independent opinions.  In some cases, it was because the arrangement violates Rule 3.4 or its common law analog.  *See, e.g., Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) (striking expert report because "witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States" in light of Maryland Rule of Professional Conduct 3.4) (internal quotations & citation omitted), *aff'd,* 43 F. App'x 547 (4th Cir. 2002); *Cosgrove v. Sears Roebuck & Co.*, No. 81 Civ. 3482 (CSH), 1987 WL 33595, at *2 (S.D.N.Y. Dec. 21, 1987) (prohibiting expert from testifying at trial after he stated in his deposition that he was being paid on a contingency fee basis, in violation of the New York Disciplinary Rules (identical in this regard to Mississippi's Rule 3.4)).  In others, it has been a product of the court discharging its "gatekeeper" role under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) to ensure that an expert witness is offering reliable testimony.  *See, e.g., Followwill v. Merit Energy Co.*, No. 03-CV-62-D, 2005 WL 5988695, at *1 (D. Wyo. Apr. 11, 2005) (granting defendants' *Daubert* motion to strike an expert's report and prohibit the expert from testifying because the expert's contingency fee arrangement rendered him partial and unreliable).

Regardless of the basis, these cases reflect the basic principle that a purportedly independent "expert" witness must not be enticed into providing improper testimony through the prospect of direct financial gain from helping achieve a favorable outcome.  Mr. O'Leary has proclaimed himself to be "fiercely independent" (O'Leary Dep., *Carriage House*, at 52), yet

11

such a claim rings hollow in light of the lucrative contingency arrangement he has struck with

Plaintiffs — as well as other disturbing correspondence from Mr. O'Leary that belie his claim of

fierce independence.  For instance, Mr. O'Leary pledged to Ralph Brockman that O'Leary would

"*[d]evelop a case for why the carrier owes [Plaintiffs] more, a lot more*, than what they have

paid."  (Mar. 17, 2008 Email L. O'Leary to R. Brockman at CH002359 (indicating that he will

"style an argument for [Plaintiffs'] case") (Ex. 13).)  Further, Mr. O'Leary suggested that if

Plaintiffs' request for an appraisal did not bear fruit, Plaintiffs would "trap" Nationwide "into

some Breach of Contract conduct" and then leverage that into a reduced contingency fee when it

hired counsel.  (Feb. 24, 2008 Email L. O'Leary to R. Brockman (via S. Belk) at CH001187 (Ex.

14).)  Simply put, Mr. O'Leary's previously-concealed contingency fee arrangements, and the

bias and partiality such arrangements (and other damning statements) evince, go well beyond

what Plaintiffs have called — twisting this Court's description of the role of an expert —

"merely highlighting the aspects of evidence favorable to Insureds."  (*See* Mem. in Opp. to Mot.

to Strike Lewis O'Leary as Litigation Expert, *Carriage House,* at 5 (citing Dec. 11, 2009 Mem.

Op., *Carriage House*, [Dkt. 215]).)  Mr. O'Leary's financial and strategic entanglements with

Plaintiffs warrant his preclusion from any involvement in the trial of this action.

### C.    MR. O'LEARY'S OPINIONS ARE AT ODDS WITH UNDISPUTED EMPIRICAL INFORMATION, AND THUS SHOULD BE PRECLUDED.

The demonstrable unreliability of Mr. O'Leary's opinions not only serves to underscore

that his lack of engineering credentials and financial entanglements render him unfit to serve as a

litigation expert, but also constitutes an independent basis for his exclusion.  Mr. O'Leary's

*wind*-damage estimates[8] are inherently unreliable because they *exceed* the *total* costs, including

---

[8]    As Nationwide has argued at length in its contemporaneously filed Memorandum in Support of its Motion for Summary Judgment, the Court should not permit Plaintiffs to present Mr. O'Leary's new wind estimates to the jury not only because they are unreliable, but because they are untimely.  Plaintiffs produced a wholly new set

repair of wind and flood damage as well as upgrades, actually incurred by Madison Homes — the company that purchased, repaired, and ultimately resold the Compass Pointe apartment complex. Because his opinion therefore conflicts with an established fact of this case, Mr. O'Leary should be stricken as Plaintiffs' litigation expert. As this Court has explained, a party is entitled to summary judgment that "repairs actually made render estimates for those same repairs irrelevant." *Legacy Condominiums, Inc. v. Landmark Am. Ins. Co.*, No. 1:06CV1108-KS-MTP, 2008 WL 80373, at *3 (S.D. Miss. Jan. 4, 2008). Here, Madison Homes has produced documents that, along with the testimony of owner Gregory Stewart, show that the ***full amount*** spent by Madison Homes to refurbish the Compass Pointe complex — ***regardless of the cause of damage*** — was just over ***$1.5 million***. (*See* Jan. 29, 2010 Deposition of Gregory Stewart, *Compass Pointe*, at 19-20 (explaining that documents include "a list of every vendor we paid with their totals" for all Compass Pointe work, and that document contains all amounts spent on Compass Pointe) (Ex. 15); *see also id.* at 56 (explaining that Madison Homes did all necessary repair work).) Given that this set of expenses includes costs incurred not only to repair flood damage, but also to install a variety of upgrades to the property, it sets a clear ceiling on the amount of total loss. (*See, e.g.*, *id.* at 40-41 (upgrade from vinyl and carpet to ceramic tile flooring); *id.* at 46 (upgrade to metal roofing); *id.* at 52 (upgraded exterior stucco).) Yet, remarkably, Mr. O'Leary's final ***wind-only estimate*** attributes ***over $2 million*** of damage to wind. (Jan. 23, 2010 Summary, Wind Damage Estimate of Lewis O'Leary, at 9 (Ex. 16).)[9]

---

of wind-damage estimates on January 25, 2010, nearly seven months after the expert deadline in this matter and after Mr. O'Leary had already been deposed, to correct their own failure to provide their expert with critical information and without seeking leave of Court or offering any explanation. (*See* Mem. in Supp. of Mot. for Summ. J. at 13-15 [Dkt. __].)

[9]    It is worth noting in this regard that the combined wind-flood estimate recently produced by Mr. O'Leary for purposes of appraisal sets the total loss at $3,251,280.74 — well over twice as much as the actual total cost incurred. (Jan. 13, 2010 Summaries of Total Damage Estimate of Lewis O'Leary (Ex. 17).) Even more stunningly, Mr. O'Leary's original wind-only estimates set a total wind-damage value of $3,048,207.21—

That Mr. O'Leary's wind-only estimates exceed this absolute, uncontestable ceiling on the total damage to the Compass Pointe property renders Mr. O'Leary's opinions irredeemably unreliable.[10]  That an expert's opinion is divorced from all empirical reality is itself strong evidence that the underlying methodology is flawed.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997).  And "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (quoting *Joiner*, 522 U.S. at 146).  When expert opinion is based on mere assertion, and where contradicted by or incapable of explaining or accounting for actual observations and data, a court is obligated, in its role as gatekeeper, to exclude the testimony.  *See Buxton v. Lil' Drug Store Prods., Inc.*, No. 2:02CV178-KS-MTP, 2007 WL 2254492, at \*10 (S.D. Miss. Aug. 1, 2007) (reviewing cases and observing that "numerous courts have rejected expert opinions on the basis that they are inconsistent with the underlying facts and data"), *aff'd*, 294 F. App'x 92 (5th Cir. 2008); *Knight v. Kirby Inland Marine, Inc.*, 363 F. Supp. 2d 859, 862 (N.D. Miss. 2005) (court must determine "whether 'expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'") (quoting *Daubert*, 509 U.S. at 591).

## CONCLUSION

For the foregoing reasons, Nationwide respectfully requests that this Court grant its Motion to Strike Lewis O'Leary and enter an Order striking Lewis O'Leary as Plaintiffs' expert.

THIS, the 16th day of February, 2010.

---

again, well over twice as much as the actual total cost incurred.  (Sept. 16, 2008 Summary, Wind Damage Estimate of Lewis O'Leary, at 9 (Ex. 18).)

[10]  The unsupported inflation of Mr. O'Leary's numbers is even further exacerbated by his use of reconstruction cost values that include depreciation that Plaintiffs are not entitled to recover in this matter.  (*See* Aug. 18, 2008 Order, *Compass Pointe* ("Plaintiffs are … bound by their recognition and acceptance of the premise that they are only entitled to the Actual Cash Value of this loss") [Dkt. 80].)

Respectfully submitted,

NATIONWIDE PROPERTY &
CASUALTY INSURANCE COMPANY,
DEFENDANT

By Their Attorneys
WATKINS LUDLAM WINTER &
STENNIS, P.A.

By:    */s/ Laura L. Hill*
       LAURA L. HILL
       lhill@watkinsludlam.com

H. Mitchell Cowan (MSB No.7734)
Laura Limerick Gibbes (MSB No. 8905)
F. Hall Bailey (MSB No. 1688)
Janet D. McMurtray (MSB No. 2774)
Christopher R. Shaw (MSB No. 100393)
Laura L. Hill (MSB No. 102247)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, MS  39205
Telephone: (601) 949-4900
Facsimile: (601) 949-4804


Of Counsel:
Daniel F. Attridge, P.C. (Bar No. 44644)
Christian D. H. Schultz (Bar No. 44747)
Robert B. Gilmore (Bar No. 44997)
Kate S. O'Scannlain (Bar No. 45034)
Jeffrey A. Todd (Bar No. 45916)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC  20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

15

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day electronically filed the foregoing using the Court's ECF system, which sent electronic notification of such filing to:

> Nathan M. Gaudet
> Matthew K. Brown
> SULLIVAN, STOLIER AND RESOR, APLC
> 909 Poydras Street, Suite 2600
> New Orleans , LA 70112
> 504/561-1044
> Fax: 504/561-8606
> ngaudet@ssrlawfirm.com
> mbrown@ssrlawfirm.com

THIS, the 16th day of February, 2010.

By:    */s/ Laura L. Hill*
   LAURA L. HILL
   lhill@watkinsludlam.com