## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**SUNQUEST PROPERTIES, INC. and
COMPASS POINTE APARTMENTS
PARTNERSHIP,**                                                   **PLAINTIFFS**

**v.**                                  **Civil Action No. 1:08-CV-692-LTS-RHW**

**NATIONWIDE PROPERTY AND
CASUALTY INSURANCE COMPANY
and JOHN DOES 1-5,**                                            **DEFENDANTS**

### MEMORANDUM OF AUTHORITIES IN SUPPORT OF
### NATIONWIDE'S MOTION FOR SUMMARY JUDGMENT

H. Mitchell Cowan (MSB No.7734)
Laura Limerick Gibbes (MSB No. 8905)
F. Hall Bailey (MSB No. 1688)
Janet D. McMurtray (MSB No. 2774)
Christopher R. Shaw (MSB No. 100393)
Laura L. Hill (MSB No. 102247)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, MS  39205
Telephone: (601) 949-4900
Facsimile: (601) 949-4804

*Attorneys for Defendant Nationwide Property and
Casualty Insurance Company*

Of Counsel:
Daniel F. Attridge, P.C. (Bar No. 44644)
Thomas A. Clare (Bar No. 44718)
Christian D. H. Schultz (Bar No. 44747)
Robert B. Gilmore (Bar No. 44997)
Kate S. O'Scannlain (Bar No. 45034)
Jeffrey A. Todd (Bar No. 45916)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................1

ARGUMENT ................................................................................................................10

I.     AT A MINIMUM, NATIONWIDE IS ENTITLED TO SUMMARY
JUDGMENT THAT THE TOTAL LOSS DID NOT EXCEED
$1,534,861.05...................................................................................................11

II.    NATIONWIDE IS ENTITLED TO SUMMARY JUDGMENT
BECAUSE PLAINTIFFS CANNOT PROVE DAMAGES.................................13

    A.    Mr. O'Leary's Estimates Are Not Competent Evidence To Support
An Award Of Damages..............................................................................13

    B.    The Reports Of Plaintiffs' Public Adjusters From Early 2006 Are
Not Probative Of Hurricane Katrina Wind Damage To Plaintiffs'
Property....................................................................................................15

    C.    The Buyers' Renovation Of The Compass Pointe Property Does
Not Provide Competent Evidence To Support Any Recoverable
Damages...................................................................................................18

III.   PLAINTIFFS ARE NOT ENTITLED TO EXTRACONTRACTUAL
DAMAGES.......................................................................................................19

    A.    Nationwide Had An Arguable Basis To Deny Plaintiffs' Claims. ............19

    B.    Plaintiffs Have Failed To Provide A Calculation Of The
Extracontractual Damages For Which They Seek To Recover. ................21

    C.    Plaintiffs Cannot Base Recovery On Illegal Rent Increases.....................24

    D.    Plaintiffs' Dealings And Dispute With Their Mortgage Lender
Eviscerate Plaintiffs' Extracontractual Damages Claim Against
Nationwide. .............................................................................................26

    E.    Plaintiffs Cannot Meet Their "Heavy Burden" In Substantiating
Claims For Bad Faith And Punitive Damages...........................................28

CONCLUSION...............................................................................................................30

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. ex rel. C.D. v. Stone Cnty. Sch. Dist.*,
  14 So. 3d 794 (Miss. Ct. App. 2009) .............................................................. 26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................... 10

*Arabian Agriculture Services Co. v. Chief Industries*,
  309 F.3d 479 (8th Cir. 2002) ....................................................................... 23

*Blades v. Countrywide Home Loans, Inc.*,
  No. 1:06CV1000-HSO-JMR, 2009 WL 3805519
  (S.D. Miss. Nov. 5, 2009) ....................................................................... 13, 14

*Blue Cross & Blue Shield of Miss., Inc. v. Campbell*,
  466 So. 2d 833 (Miss. 1984) ................................................................... 28, 29

*Brockman v. LNR Partners, Inc.*,
  No. 1:07CV58-LG-JMR (S.D. Miss. Jan. 24, 2007) .................................... 26, 27

*Broussard v. State Farm Fire & Cas. Co.*,
  523 F.3d 618 (5th Cir. 2008) ....................................................................... 28

*Capps v. Postal Tel. Cable Co.*,
  19 So. 2d 491 (Miss. 1944) ......................................................................... 24

*Catlin Syndicate Ltd. v. Imperial Palace of Miss., Inc.*,
  No. 1:08CV97-HSO-JMR, 2008 WL 5235888
  (S.D. Miss. Dec. 15, 2008) .......................................................................... 25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................. 10, 11

*Cherry v. Anthony, Gibbs, Sage*,
  501 So. 2d 416 (Miss. 1987) ....................................................................... 29

*CQ, Inc. v. TXU Mining Co.*,
  565 F.3d 268 (5th Cir. 2009) ....................................................................... 23

*Dauro v. Allstate Ins. Co.*,
  No. 1:00CV138RO, 2003 WL 22225579
  (S.D. Miss. Sept. 17, 2003),
  *aff'd*, 114 F. App'x 130 (5th Cir. 2004) ........................................................ 28

*Downing v. City of Jackson*,
   24 So. 2d 661 (Miss. 1946) .......................................................................... 24

*Eason v. Thaler*, 73 F.3d 1322 (5th Cir. 1996) .......................................................... 11

*Essinger v. Liberty Mut. Fire Ins. Co.*,
   534 F.3d 450 (5th Cir. 2008) ............................................................... 19, 20

*Favre Prop. Mgmt., LLC v. Cinque Bambini*,
   863 So.2d 1037 (Miss. Ct. App. 2004) ....................................................... 13

*Finger Furniture Co. v. Commonwealth Ins. Co.*,
   404 F.3d 312 (5th Cir. 2005) ..................................................................... 25

*Forsyth v. Barr*,
   19 F.3d 1527 (5th Cir. 1994) ..................................................................... 11

*Frascogna v. Wells Fargo Bank, N.A.*,
   No. 3:07CV96-DPJ-JCS, 2009 WL 2843284
   (S.D. Miss. Aug. 31, 2009) ........................................................................ 13

*Gulledge v. Shaw*,
   880 So. 2d 288 (Miss. 2004) ...................................................................... 26

*Gunn v. Lexington Ins. Co.*,
   No. 1:07CV478-LTS-RHW, 2008 WL 2039543
   (S.D. Miss. May 12, 2008) ............................................................. 20, 29, 30

*Hoffman v. Constr. Protective Servs., Inc.*,
   541 F.3d 1175 (9th Cir. 2008) ................................................................... 23

*Legacy Condominiums, Inc. v. Landmark American Ins. Co.*,
   No. 1:06CV1108-KS-MTP, 2008 WL 80373
   (S.D. Miss. Jan. 4, 2008) .......................................................... 11, 14, 20, 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................. 11

*Morrissey v. Bologna*,
   123 So.2d 537 (Miss. 1960) ....................................................................... 24

*Murphree v. Federal Ins. Co.*,
   707 So.2d 523 (Miss. 1997)………………………………………….......................30

*Noxubee Cty. Sch. Dist. v. United Nat'l. Ins. Co.*,
   883 So. 2d 1159 (Miss. 2004) .................................................................... 29

*O'Cain v. Harvey Freeman and Sons, Inc.*,
   603 So. 2d 824 (Miss. 1991) ..................................................................... 25

*Pilate v. American Federated Ins. Co.*,
    865 So. 2d 387 (Miss. Ct. App. 2004) ............................................................. 30

*Price v. Purdue Pharma Co.*,
    920 So. 2d 479 (Miss. 2006) ......................................................................... 24

*Ragas v. Tennessee Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998) .................................................................... 10, 11

*Sentinel Indus. Contr. Corp. v. Kimmins Indus. Serv. Corp.*,
    743 So. 2d 954 (Miss. 1999) ......................................................................... 28

*Sobley v. Southern Natural Gas Co.*,
    302 F.3d 325 (5th Cir. 2002) ....................................................................... 20

*Sunquest Properties, Inc. & Carriage House Apartments Partnership v. Nationwide
    Prop. & Cas. Ins. Co.*,
    1:08-CV-687-LTS-RHW ..................................................................... passim

*Sunquest Properties, Inc. & Compass Pointe Apartments Partnership v. Nationwide
    Prop. & Cas. Ins. Co.*,
    1:08-CV-692-LTS-RHW ..................................................................... passim

*United States Fid. & Guar. Co. of Miss. v. Martin*,
    998 So. 2d 956 (Miss. 2008) ..................................................................... 28, 30

*Universal Life Ins. Co. v. Veasley*,
    610 So. 2d 290 (Miss. 1992) ......................................................................... 19

*Western Union Tel. Co. v. McLaurin*,
    66 So. 739 (Miss. 1914) ............................................................................. 24

**Statutes**

Miss. Code Ann. § 75-24-25 ................................................................................ 25

Miss. Code Ann. § 75-24-25(2) ........................................................................... 24

**Rules**

Fed. R. Civ. P. 26(a)(1)(A)(iii) ........................................................................... 20

Fed. R. Civ. P. 26(a)(1)(C) ................................................................................ 20

Fed. R. Civ. P. 37(c)(1) ................................................................................ 21, 23

**Other Authorities**

Attorney General Opinion No. 2005-0554,
    2005 WL 3775648 (Miss. A.G. Nov. 21, 2005)……………………………….............25

## INTRODUCTION

Nationwide is entitled to summary judgment because there is no record evidence that would allow a reasonable fact-finder to award damages for any covered item of loss for which Nationwide has not already compensated Plaintiffs.  Lacking competent record evidence that would permit an award of damages, Plaintiffs cannot present their breach of contract claim to a jury.  Similarly, Plaintiffs lack any basis for asserting extra-contractual damages.  As a result, this Court should grant Nationwide's Motion for Summary Judgment and enter an Order dismissing Plaintiffs' claims as a matter of law.

## BACKGROUND

Plaintiffs Sunquest Properties, Inc. and Compass Pointe Apartments Partnership owned and managed an apartment complex comprised of twelve separate apartment buildings and three ancillary buildings located at 4100 Chicot Street in Pascagoula, Mississippi ("the Property").  The Property is located approximately 2.4 miles inland from the Mississippi Sound, 2.3 miles east of the Pascagoula River, and 1.3 miles southeast of Krebs Lake.  (*See* July 31, 2009 KKAI Meteorology Analysis of Hurricane Katrina Wind & Storm Tide Report at 9 & Fig. 3 (Ex. 1).)  At the time of Hurricane Katrina, the Property was insured through a standard Business Provider Policy issued by Nationwide, with policy number 6323 BP 139742 0003 ("the Policy").  (*See* Oct. 3, 2008 Certified Copy of Nationwide Bus. Provider Policy 6323 BP 139742 0003 at NW-1SUN000015 (Ex. 2).)  The Policy provided total coverage limits of $4,386,616 for the apartment buildings and business personal property, and also allowed for loss of business income (subject to the terms, conditions, limits, endorsements, and exclusions set forth in Plaintiff's policy).  (*See* Certified Policy, Bus. Provider Policy Decls. & Suppl. Decls. at NW-1SUN000017-37.)

Plaintiffs' Policy contains a standard flood exclusion, which was approved by the Mississippi Department of Insurance.  The policy's flood exclusion specifically provides:

A.  COVERED CAUSES OF LOSS
When Special is shown in the Declarations, Covered Causes of Loss means RISK OF DIRECT PHYSICAL LOSS unless the loss is:

1.  Excluded in Section B., Exclusions; or
2.  Limited in Section C., Limitations;
that follow

B.  EXCLUSIONS
1.  **We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss**. …

g.  **Water**
(1)  **Flood, surface water, waves, tidal, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not**;

(Certified Policy, Bus. Provider Special Prop. Coverage Form BPP-0006 at NW-1SUN000092.)[1]

Plaintiffs' policy also contains a specific and unambiguous exclusion for "Consequential Losses."  (*Id.* at NW-1SUN000098.)  This exclusion, which was also approved by the Mississippi Department of Insurance, states that Nationwide will not pay for losses or damages caused by or resulting from "[d]elay, loss of use or loss of market."  (*Id.*)  In addition, Plaintiffs' policy requires policyholders to mitigate damage to the property following a loss.  The applicable policy provision, entitled "Duties in the Event of Loss or Damage," states that after a loss, the policyholder must "[t]ake all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss."  (*Id.* at NW-1SUN000100.)

On August 29, 2005, the Property sustained substantial damage from Hurricane Katrina. It is undisputed that the Property was inundated with at least 2.5 feet of storm surge flooding above the average first floor level of the apartments.  (*See* KKAI Meteorology Analysis at 12-13.)

On August 30, 2005, Sunquest employee Angylyn Swanson reported the damage to the Property to Nationwide and made a claim for coverage under the Policy.  (*See* All Activity Logs

---

[1]   Emphasis added unless otherwise noted.

at NW-1SUN001998-99 (Ex. 3).)   Approximately eleven days later, a Nationwide adjuster visited the loss site for an initial assessment of the damage and reported roof damage, loss of siding, and interior water damage.  (*See id.* at NW-1SUN001996.)   As a result, the adjuster contacted a local roofer to install temporary blue roof tarps in order to secure the roofs and to permit Nationwide's adjusters to initially assess the damage to each building.  (*See id.*)   By September 11, 2005, roofers had begun installing the roof tarps at Nationwide's request and expense.  (*See id.* at NW-1SUN001984-86 (Nationwide negotiated and paid tarp charge on September 29, 2005); Blue Tarp Invoice at NW-1SUN001381 (Ex. 4).)

Nationwide's adjuster had also completed his initial visual inspection of the Property by September 11, 2005, reporting damages which included roof damage, siding damage, interior water damage, and the collapse of some exterior brick walls attached to the outside stairwells. (*See* All Activity Logs at NW-1SUN001995-96.)   Thereafter, Nationwide designated a team of adjusters to fully scope and write estimates for all covered damages at the Property and adjust the Plaintiffs' claim to its conclusion.   Those adjusters began inspecting the Property on September 23, 2005 and started preparing estimates of the wind-related exterior damages to the Property. (*See id.* at NW-1SUN001990.)   By September 28, 2005, the exterior inspection and damage estimates were completed.  (*See id.* at NW-1SUN001986.)   Accordingly, on September 29 and 30, 2005, Nationwide tendered its initial payments to the Plaintiffs totaling $109,875.65 for wind-related damage to the exterior of the property, less depreciation.  (*See* Claim Check Copies for Exterior Damage (Ex. 5).)   Notably, Nationwide's adjuster's notes indicate that Nationwide was attempting to expedite roof repairs and drying at the Property by completing its adjustment of all exterior damages first.  (*See* All Activity Logs at NW-1SUN001986.)   However, as Plaintiffs have admitted, none of the exterior damage payments were used for those mitigating purposes. (Jan. 19, 2010 Deposition of Ralph Brockman, *Compass Pointe*, at 127, 155 (Ex. 6).)[2]

---

[2]   To assist the Court, the following designations will apply for the record citations: "*Carriage House*" will refer to *Sunquest Properties, Inc. & Carriage House Apartments Partnership v. Nationwide Prop. & Cas. Ins. Co.,*

In light of the existence of undisputed flood damage at the Property, Nationwide issued a Reservation of Rights letter to the Plaintiffs on September 24, 2005, but continued to inspect and estimate the interior damage. (*See* Sept. 24, 2005 Reservation of Rights Letter (Ex. 7).) Nationwide also retained an engineering firm on September 29, 2005 to document the scope of damage to the property and determine the causation of the loss. (*See* All Activity Logs at NW-1SUN001986.) On October 3, 6, 8, and 15, 2005, an engineer from National Forensic Consultants ("NFC") separately inspected the Property and began to prepare a comprehensive damage assessment report to Nationwide based on his investigation, which was ultimately completed and received by Nationwide on January 7, 2006. (*See* Nov. 18, 2005 NFC Report at NW-1SUN001407-1479 (Ex. 8).)[3] The NFC Report concluded that winds from Hurricane Katrina caused roof damage, ceiling damage, and some framing damage, while rising flood water damaged the gypsum board walls, insulation, carpeting, and cabinetry in all first floor units up to an average level of approximately twenty-four inches. (*See id.* at NW-1SUN001410-11.)

In the meantime, Nationwide's adjusters completed their re-inspection of the Plaintiffs' property and finished preparing interior damage estimates in October, 2005. (*See* All Activity Logs at NW-1SUN001982.) On October 20, 2005, based upon its exhaustive investigations, Nationwide tendered additional checks to the Plaintiffs totaling $230,263.94 for wind-related damages to the interiors of the Compass Pointe apartment units. (*See* Claim Check Copies for Interior Damage (Ex. 9).) Nationwide also sent copies of its completed damage estimates to the Plaintiffs. (*See* All Activity Logs at NW-1SUN001982.) At the same time, Nationwide adjuster Jim Biggs noted that, while exterior damage payments had been made on September 29, 2005 "so that work could beg[in]," Plaintiffs had not started any work as of October 21, 2005. (*Id.*)

---

1:08-CV-687-LTS-RHW, *"Compass Pointe"* will refer to *Sunquest Properties, Inc. & Compass Pointe Apartments Partnership v. Nationwide Prop. & Cas. Ins. Co.,* 1:08-CV-692-LTS-RHW.

[3] The NFC engineer noted that, at the time of his inspections, "[n]o mitigation of drywall or clean-up of any apartment units had commenced." (*Id.* at NW-1SUN001410.)

Nationwide adjuster Jim Biggs wrote to the Plaintiffs on November 15, 2005 regarding the remaining lost rent payments owed under the Policy.  (*See* Nov. 15, 2005 Letter J. Biggs to R. Brockman & W. Brockman (Ex. 10).)   Based on its prior damage estimates, Nationwide projected that it would take a total of six months for Plaintiffs to repair the Property.  (*See id.*)  As a result, Nationwide agreed to pay for a total of six months' lost rent, unless Plaintiffs produced new documentation indicating that additional amounts were owed.  (*See id.*)  Hearing nothing from the Plaintiffs, Nationwide tendered a check to them in the amount of $86,622.00 for lost rents on December 4, 2005.[4]  (*See* Claim Check Copy No. 91-000985927 (Ex. 11); Dec. 4, 2005 Letter J. Biggs to R. Brockman & W. Brockman (Ex. 12).)  After receiving this payment, Plaintiffs provided Nationwide with additional information indicating that two upstairs apartments had also been rendered uninhabitable by a broken exterior staircase.  All Activity Log at NW-1SUN001976.  Accordingly, Nationwide tendered a check in the amount of $5,322 — representing the balance of lost rents owed — on December 13, 2005.  (*See* Claim Check Copy No. 91-000985932 (Ex. 13).)

Despite Nationwide's payments, which began as early as September 29, 2005, no repairs had been started at the Property by the end of October 2005.  (*See* All Activity Logs at NW-1SUN001982.)  And despite receiving a total of $340,139.59 in payments from Nationwide by October 20, 2005, in addition to receiving protective roof tarps installed at a cost of $23,821 to Nationwide (*see* Blue Tarp Invoice), Plaintiffs still had not initiated any repair activity at the Property by January, 2006 (*see* All Activity Log at NW-1SUN001964).[5]

---

4    Nationwide calculated this amount using a spreadsheet produced by the Plaintiffs, which detailed the units that were determined to be uninhabitable as a result of Hurricane Katrina.  (*See* Nov. 15, 2005 Letter J. Biggs to R. Brockman & W. Brockman.)

5    In fact, despite receiving more than $455,000.00 from Nationwide by January, 2006, ***Plaintiffs never performed any repairs or clean-up work*** following Hurricane Katrina with the exception of removing debris from the parking lot and exterior grounds of the Property.  (*See* Jan. 6, 2010 Letter C. Higley to M. Brown (Ex. 14); R. Brockman Dep., *Compass Pointe*, at 187.)  Plaintiffs took no steps whatsoever to remove soaked and moldy carpets and fallen insulation, tear out wet sheetrock and other damaged materials, or otherwise clean out the interiors of the first floor apartments which sustained flood damage.  (*See* Nov. 18, 2009 Deposition of Donna Bass at 147 (Ex. 15).)  Nor did Plaintiffs properly maintain the tarps on the roofs.  As Mr. Stewart made

The next month, Nationwide received notification that the Plaintiffs had retained the public adjusting firm of WorldClaim, P.A. ("WorldClaim") to prepare its own damage estimates for the Property.  (*See id.* at NW-1SUN001967; Feb. 3, 2006 Letter D. DiSanto to Nationwide (Ex. 17).)  On February 14, 2006, Nationwide adjuster Jim Biggs agreed to review any additional documentation when received.  (*See* All Activity Logs at NW-1SUN001967.)  The next day, Nationwide reopened the Plaintiffs' claim to evaluate any replacement cost issues under the Policy.  (*See id.* at NW-1SUN001966.)  Ultimately, however, Nationwide did not receive copies of WorldClaim's damage estimates for the Property until August 15, 2006.  (*See id.* at NW-1SUN001960.)  Upon their receipt, Nationwide adjuster Jim Biggs looked over the estimates and agreed to follow-up with the policyholders regarding the change in ownership of the Property, the progress of repairs, and for purposes of determining any replacement cost hold-back that may have been owed on the claim.  (*See id.*)

On August 21, 2006, Mr. Biggs spoke to the owners of Madison Homes, LLC, Greg Stewart and David Pilger, and learned that they were planning to purchase the Property from Plaintiffs.  (*See id.*)  Mr. Biggs was also informed that Madison Homes had initiated the repair work at the Property.  (*See id.*)  Because the repairs were being performed by and at the expense of the new prospective owners of the Property — not the insureds — Nationwide decided to hold any potential replacement cost payment until the repairs were actually completed, and to follow-up with the new owners after closing to determine whether replacement cost should be allowed. (*See id.* at NW-1SUN001959.)  Ultimately, however, Plaintiffs sold the property "as is" before the repairs were completed, and Plaintiffs were therefore not entitled to recover replacement cost holdback for the Property.  (*See id.* at NW-1SUN001955.)

Indeed, without any notification to Nationwide, Plaintiffs entered into a contract on August 18, 2006 to sell the Property to Platinum Investments, LLC for a total purchase price of

---

clear, at the time Madison Homes purchased the property approximately one year after Hurricane Katrina, "there were no effective tarps on the roofs … so you can only imagine how much damage happened in the course of a year." (Jan. 29, 2010 Deposition of Greg Stewart, *Compass Pointe*, at 72 (Ex. 16).)

$2,700,000.00.  (*See* Aug. 18, 2006 Agreement for the Purchase and Sale of Real Estate (Ex. 18).)  In addition to the purchase price, Platinum Investments paid Plaintiffs $14,179 per month as rent for the Property between the date of the sales contract and the eventual final closing date of December 8, 2006, while the new buyer conducted repairs.  (*See* Stewart Dep. at 66-67; Dec. 8, 2006 HUD Settlement Statement (Ex. 19).)  During his deposition, Madison Homes owner and Platinum Investments partner Greg Stewart testified that the total cost to repair the damage to the Property caused by Hurricane Katrina — including flood damage and additional damage caused by Plaintiffs' failure to mitigate their existing loss — was just $1,534,861.05, including labor, services, supplies and goods.  (*See* Stewart Dep. at 19-24, 29-30; *infra* page 11.)

Over the next two years, Nationwide heard nothing from the Plaintiffs.  During that time, Plaintiffs initiated a separate legal action against their mortgage servicer, LNR Partners, Inc. ("LNR"), challenging the prepayment penalties imposed by LNR as a result of Plaintiff's early mortgage payoff.  As part of that action, Plaintiffs claimed that ***LNR acted in bad faith*** and "breached its obligations under [the loan] documents ***by its refusal to apply the insurance proceeds*** received [from Nationwide] as a result of the destruction of the properties caused by Hurricane Katrina ***to either the respective loan balances or the restoration of the properties***." (Oct. 30, 2006 Letter C. McBride to B. Furr at CH001981 (Ex. 20).)  Plaintiffs alleged that, as a result of this alleged breach by LNR, they "lost the opportunity to realize the profits they would have otherwise realized, had they not been ***forced by LNR to sell their interests in the properties at a distressed price***." (*Id.* at CH001985.)  Plaintiffs' current litigation position in this lawsuit, by comparison, is that they were forced to sell the property, and consequently forego enormous profits as a result of Nationwide's alleged failure to provide insurance proceeds.  (*See* Oct. 8, 2009 Letter N. Gaudet to K. O'Scannlain at 2 (Ex. 21).)

On June 20 and July 21, 2008, Plaintiffs wrote to Nationwide and demanded an appraisal of their loss pursuant to the appraisal provision of the subject Policy.  (*See* June 20, 2008 Letter R. Brockman to C. Kraner (Ex. 22); Jul. 21, 2008 Letter R. Brockman to C. Kraner (Ex. 23).)

The driving force behind Plaintiffs' appraisal request, discovery has revealed, is Lewis O'Leary — the individual Plaintiffs have identified in litigation as both their "competent and impartial" appraiser and their litigation expert, but who has also performed extensive claims handling and consultant services to Plaintiffs.[6]  Mr. O'Leary was initially retained by the Plaintiffs in May, 2007.  (*See* Oct. 6, 2009 Deposition of Lewis O'Leary, *Carriage House*, at 76-77 (Ex. 24); May 3, 2007 Email L. O'Leary to S. Belk with attachments (Ex. 25).)[7]  He was recommended to the Plaintiffs as someone who could perform "consulting services" that would "assist [them] in resolving [Plaintiffs'] outstanding insurance claim."  (O'Leary Dep. at 77.)  As O'Leary has admitted, he ultimately was hired to help Plaintiffs determine whether "[they] ha[d] a case regarding substantially more money than what Nationwide had offered [them]."  (*Id.* at 80.) Indeed, in early correspondence with the Plaintiffs, O'Leary identified "Part 1 of [his] assignment" as "***[d]evelop[ing] a case for why the carrier owes you more, a lot more***, than what they have paid you" and to "***style an argument for your case***."  (Mar. 17, 2008 Email L. O'Leary to R. Brockman (via S. Belk) (Ex. 27).)  The best such approach, according to O'Leary, was an appraisal in which he would argue for an amount exceeding the actual cost to repair the damage:

> In the Appraisal Process, we can legitimately go after the difference between the price you sold the properties for, "as is" and the price they got for them after repairing them.  Going after this amount, which will ***exceed the cost to repair***, is [*sic*] will make this an ***exceptionally good case to pursue***.  Of course we still need

---

[6]  Nationwide moved separately to strike Mr. O'Leary as the Plaintiffs' appraiser in this matter [Dkt. 111-112]. Although that Motion was denied on December 11, 2009, Nationwide moved the Court to reconsider its December 11, 2009 ruling on December 17, 2009 [Dkt. 170], and that Motion to Reconsider is still pending.  As a result, Nationwide fully incorporates and reasserts herein by reference all of the facts and legal arguments set forth in those two fully-briefed motions.

[7]  Over the two and one-half years since he was initially retained in connection with Plaintiffs' claim, Mr. O'Leary has served as Plaintiffs' claim consultant, wind appraisal consultant, forensic engineering consultant, testifying expert, and appraiser.  For these services he has collected upwards of $140,000 from the Plaintiffs. (Payments to Lewis O'Leary at CJ001177 (Ex. 26).)  Mr. O'Leary completed his estimates, formed his opinions, and wrote his expert report under a contract entitling him to a 4% contingency fee that Plaintiffs now admit was impermissible.  (*See* Mem. in Supp. of Mot. for Summ. J. at 6-7.)

to produce an estimate of the actual damages to basically validate what portion of the difference should be allocated to wind versus flood.

(*See* Jan. 26, 2008 Planning Memo at CH001181 (Ex. 28); May 3, 2007 Email L. O'Leary to S. Belk at CH001197 ("[T]he rendering of these awards is usually the beginning of the end of the case, in that loosing [*sic*] one of these Appraisals, especially by a large margin, usually stimulates a strong desire by the carrier to settle all issues without a trial.") (Ex. 29).)

Nationwide responded to Plaintiffs' appraisal demand by letter dated August 21, 2008 and agreed to participate in an appraisal consistent with the Plaintiffs' policy and with Mississippi law. (*See* Aug. 21, 2008 Letter P. Hagan to R. Brockman (Ex. 30).) However, Nationwide emphasized that it would not agree to submit non-covered items for appraisal. (*See id.*) Rather than participate in an appraisal as offered and defined under the policy, Plaintiffs filed suit. (*See* Oct. 8, 2008 Am. Compl. [Dkt. 3].)

During the course of discovery, Nationwide retained independent engineering expert Jim Skees, independent damage valuation expert Robert Martin, and meteorologist Brian Jarvinen. (*See* June 30, 2009 NW Designation of Experts [Dkt. 39].) Mr. Skees prepared a cause and origin report of all damage that occurred to the Property, which he submitted to Nationwide on September 18, 2009. (*See* Sept. 18, 2009 James Skees Apartment Buildings Hurricane Damage Evaluation (Ex. 31).) Building upon Mr. Skees' causation analysis, Mr. Martin prepared a separate report in which he estimated that the actual cash value of the wind-related damage at the Property totaled $455,020.08 ($385,329.82 without overhead and profit). (*See* Sept. 30, 2009 Letter R. Martin to R. Gilmore (Ex. 32).)

Thereafter, new evidence came to light during discovery which prompted Nationwide to request that Mr. Martin revisit and possibly revise his original damage estimates for the Property. (*See* Jan. 6, 2010 Letter C. Higley to M. Brown.) Mr. Martin completed his first revised estimates for the Property on January 4, 2009. (*See id.*) Based on those revised estimates, and as part of its good faith obligation to continue to reevaluate Plaintiffs' claim as new information is

obtained, Nationwide tendered an additional payment of $84,062.58 to the Plaintiffs on January 6, 2010.  (*See id.*)  This amount represented the difference between Mr. Martin's first revised damage estimate and the amount of Nationwide's prior payments for wind-related damage to the Property, less Plaintiffs' deductible.  (*See id.*)

Then, additional new information surfaced during the depositions of Nationwide employees Jim Biggs, and Nick Hatfield, and during the deposition of Mr. Martin.  As a result, Nationwide again requested that Mr. Martin to review his original report and estimates, as part of Nationwide's ongoing effort to review Plaintiffs' claim in light of all information received.  (*See* Feb 2, 2010 Letter C. Higley to M. Brown (Ex. 33).)  Mr. Martin's second revised report was completed on January 29, 2010, and it provided a new total estimate of $551,170.10 Actual Cash Value ("ACV") ($466,149.38 ("ACV") without overhead and profit) for wind-related damage to the Property.  (*See id.*)  On February 2, 2010, Nationwide tendered a second, supplemental payment to the Plaintiffs in the amount of $24,428.78, representing the difference between Mr. Martin's latest estimates, less Plaintiffs' deductible.  (*See id.*)  To date, Nationwide has paid Plaintiffs a total of $564,395.88 — $472,451.88 for wind-related damage to the Property, and $91,944.00 for lost rents.

## ARGUMENT

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party has made an initial showing that no evidence supports the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue.  *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."  *Ragas*, 136 F.3d at 458.  Mere conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence and, thus, are insufficient to defeat a motion for summary judgment.  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).  If the nonmoving party fails to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23.

## I.      AT A MINIMUM, NATIONWIDE IS ENTITLED TO SUMMARY JUDGMENT THAT THE TOTAL LOSS DID NOT EXCEED $1,534,861.05.

As this Court has explained, ***a party is entitled to summary judgment that "repairs actually made render estimates for those same repairs irrelevant."***  *Legacy Condominiums, Inc. v. Landmark American Ins. Co.*, No. 1:06CV1108-KS-MTP, 2008 WL 80373, at *3 (S.D. Miss. Jan. 4, 2008).  Here, Nationwide is entitled to summary judgment that the total loss, from all causes, cannot exceed the actual repair and refurbishment costs incurred by the new buyers.  Madison Homes, the company that purchased, repaired, and resold the Compass Pointe apartment complex, has produced documents that, along with the testimony of owner Gregory Stewart, show that the ***full amount*** spent by Madison Homes to refurbish the Compass Pointe complex — ***regardless of the cause of damage, and including upgrades*** — was ***$1,534,861.05***.[8] (*See* Jan. 28, 2010 Madison Homes Jobs Costs by Job and Vendor Summary (Ex. 34); Jan. 29, 2010 Madison Homes Profit & Loss by Job (Ex. 35); Stewart Dep. at 19-20 (explaining that documents include "a list of every vendor we paid with their totals" for all Compass Pointe work

---

8   Even adding 20% for profit and overhead on all of the expenses incurred by Madison Homes, which may be an overestimate as to certain items, the figure would only be increased by $306,972.21, to a total of $1,841,833.26.  Of course, the reconstruction cost of all items of loss must also be discounted to account for depreciation.  (Aug. 18, 2009 Order ("Plaintiffs are also bound by their recognition and acceptance of the premise that they are only entitled to the Actual Cash Value of this loss.") [Dkt. 78].)

and contain all amounts spent on Compass Pointe); *id.* at 29-30 (explaining that Madison Homes Profit & Loss document contains total costs, but that $5,000 interest charge should be deducted).)   Given that this set of expenses includes costs incurred not only to repair flood damage, but also to install a variety of upgrades to the property, it sets a clear (albeit overly generous) ceiling on the amount of total loss.   (*See, e.g.*, *id.* at 40-41 (upgrade from vinyl and carpet to ceramic tile flooring); *id.* at 46 (upgrade to metal roofing); *id.* at 52 (upgraded exterior stucco).)

There is no material dispute concerning the fact that the total cost of repairing and refurbishing Compass Pointe was just over $1.5 million.   As Plaintiffs' representative Ralph Brockman testified, Plaintiffs "didn't repair the property," but rather "[t]he person we sold to completely repaired the property."   (R. Brockman Dep., *Compass Pointe*, 187.)   Indeed, Plaintiffs themselves spent no more than $71,537.92 in the interim between Hurricane Katrina and the sale of the property.   (*See* Sept. 30, 2009 Pls.' Answer to Irrog. No. 28 (Ex. 36); R. Brockman Dep., *Compass Pointe*, at 188, 193-94 (explaining that expenses incurred by Plaintiffs "were the out-of-pocket expenses we paid for during that interim period, but it was not to fix -- repair all the property," and agreeing that check register included "all the money plaintiffs themselves paid out of pocket to do any kind of repairs or renovations to Compass Pointe between the time of hurricane Katrina and when they transferred title to Platinum Investments").)   As Mr. Stewart confirmed, Madison Homes repaired all items of damage.   (*See* Stewart Dep. at 56.)   Similarly, Ms. Elisabeth Purvis, the Compass Pointe property manager from October of 2006 through the present, confirmed that there were no "items of damage that weren't repaired during the renovations." (Feb. 1, 2010 Deposition of Elisabeth Purvis at 38 (Ex. 37).)   It is clear, therefore, that the Madison Homes costs, along with those incurred by Plaintiffs, are the comprehensive and authoritative total amount of all repairs and renovations performed on the property.

## II.   NATIONWIDE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS CANNOT PROVE DAMAGES.

Plaintiffs' breach of contract claim should be dismissed because they have no evidence to support their claim that Nationwide "caused contract damages" of any amount, let alone for "the complete and full extent of damage and loss to the apartment buildings."  (Am. Compl. ¶ 24.) As demonstrated below, discovery has closed without any admissible evidence on the record that would allow a reasonable fact-finder to award damages for any covered item of loss for which Nationwide has not already compensated Plaintiffs.   Because they have "therefore failed to establish an element essential to their breach of contract claim," Plaintiffs' inability to establish an entitlement to damages warrants dismissal.  *Frascogna v. Wells Fargo Bank, N.A.*, No. 3:07CV96-DPJ-JCS, 2009 WL 2843284, at *6 (S.D. Miss. Aug. 31, 2009) (citing *Favre Prop. Mgmt., LLC v. Cinque Bambini*, 863 So. 2d 1037, 1044 (Miss. Ct. App. 2004) (describing elements of breach of contract under Mississippi law, including damages)); *Blades v. Countrywide Home Loans, Inc.*, No. 1:06CV1000-HSO-JMR, 2009 WL 3805519, at *4 (S.D. Miss. Nov. 5, 2009) ("Because [plaintiff] has not been able to adduce sufficient evidence to create an issue of fact for trial on the issue of damages, which is an essential element of her claim for relief, she has not carried her summary judgment burden.").

### A.   Mr. O'Leary's Estimates Are Not Competent Evidence To Support An Award Of Damages

As discussed above, it is an established fact in this case that the full amount spent by Madison Homes to repair and upgrade the Compass Pointe complex — regardless of the cause of damage — was just over $1.5 million.  Yet, remarkably, the final ***wind-only estimate*** adopted by Mr. O'Leary attributes ***$2,063,919.37*** of damage to wind.  (Jan. 23, 2010 Summary, Wind Damage Estimate of Jerry Wiggins at 9 (Ex. 38).)[9]  Mr. O'Leary's ***wind***-damage estimates are

---

[9]   It is worth noting in this regard that the combined wind-flood estimate recently produced by Mr. Wiggins for Mr. O'Leary for purposes of appraisal sets the total loss at $3,251,280.40 — well over twice as much as the actual total cost incurred.  (Jan. 13, 2010 Summaries of Total Damage Estimate of Jerry Wiggins (Ex. 39).) Even more stunningly, Mr. O'Leary's original wind-only estimates set a total wind-damage value of

therefore inherently unreliable, and not competent to be presented to the jury, because they substantially **exceed** the **total** costs — including repair of wind and flood damage from Hurricane Katrina, repair of damage resulting from Plaintiffs' lack of mitigation efforts, and upgrades to finishes, flooring, and roofing — actually incurred by Madison Homes.   *Cf. Legacy Condominiums*, 2008 WL 80373, at *3.   In fact, as Nationwide argues in its contemporaneously filed Motion to Strike Mr. O'Leary, the demonstrable unreliability of Mr. O'Leary's opinion requires that Mr. O'Leary be struck as Plaintiffs' litigation expert.   In either event, Mr. O'Leary's wind-damage estimates cannot be submitted to the jury, and Plaintiffs thus have no expert testimony to "create an issue of fact for trial on the issue of damages, which is an essential element of [Plaintiffs'] claim for relief."   *Blades*, 2009 WL 3805519, at *4.   Accordingly, Plaintiffs cannot and have "not carried [their] summary judgment burden" by producing these estimates.  *Id.*

Furthermore, Plaintiffs should not be permitted to rely on Mr. O'Leary's new estimates because they fail to comply with the Court's Scheduling Order and the Federal Rules.  Plaintiffs' originally produced estimates of the wind damage to the Compass Pointe complex on June 29, 2009, the date of the expert disclosure deadline in this matter.  When it became apparent in Mr. O'Leary's deposition in the *Carriage House* matter that Mr. O'Leary had completed those estimates without even considering a wealth of information that Nationwide had compiled following Hurricane Katrina, but that Plaintiffs failed to "ma[ke] available to [Mr. O'Leary and Mr. Wiggins] when they initially prepared their reports," Plaintiffs set out to re-do their expert reports in both cases.  (Nov. 24, 2009 Opp. to Mot. to Preclude Lewis O'Leary & Jerry Wiggins from Presenting Evidence or Test., *Carriage House*, at 2 [Dkt. 200].)  As Mr. Wiggins has explained, "[t]he 'new information' renders the original estimate obsolete and any discussion of it is pointless."  (*See* Dec. 10, 2009 Email J. Wiggins to N. Gaudet (Ex. 41).)  Yet despite the fact

---

$3,073,390.01 — again, well over twice as much as the actual total cost incurred.  (Sept. 16, 2008 Summary, Wind Damage Estimate of Jerry Wiggins at 9 (Ex. 40).)

that Mr. O'Leary needed to undertake a wholesale do-over of his original expert report,[10] Plaintiffs never sought leave of this Court.  Instead, without permission from the Court or explanation to Nationwide, Plaintiffs waited for over 14 weeks after Mr. O'Leary's *Carriage House* deposition to produce a new set of estimates, finally producing them on January 25, 2010 — nearly seven months after the expert deadline, and after Mr. O'Leary had already been deposed in the *Compass Pointe* matter.[11]  Indeed, Plaintiffs had not even provided Mr. Wiggins with the new materials in the *Compass Pointe* matter as of December 17, 2009.  (*See* Dec. 17, 2009 Email J. Wiggins to N. Gaudet (Ex. 43).)  And only after he received that information was he even informed of the mid-January deadline that Plaintiffs had claimed he and Mr. O'Leary needed.  (*See* J. Wiggins Dep., *Compass Pointe*, at 61; Nov. 25, 2009 Mem. in Supp. of Mot. for Extension of Time to Complete Discovery, *Carriage House*, at 2 [Dkt. 202].)  Having failed to seek and receive this Court's permission for their out-of-time expert report re-do, Plaintiffs cannot present these late-produced estimates to the jury.

**B.     The Reports Of Plaintiffs' Public Adjusters From Early 2006 Are Not Probative Of Hurricane Katrina Wind Damage To Plaintiffs' Property.**

Neither can Plaintiffs point to the damage estimates prepared on their behalf by WorldClaim public adjusters in early 2006, over five months after Hurricane Katrina itself, as evidence of the existence of any covered items of loss for which Plaintiffs have yet to be compensated.   WorldClaim's 30(b)(6) witness, who was himself personally responsible for ensuring the accuracy of WorldClaim's estimates, acknowledges that the estimates provided

---

[10]   As Plaintiffs themselves put it, "Lewis O'Leary and Jerry Wiggins … have expressed a need to substantially revise their expert conclusions."  (Opp. to Mot. to Preclude Lewis O'Leary & Jerry Wiggins from Presenting Evidence or Test. at 2.)  The changes to Mr. O'Leary's report were hardly mere revisions.  Indeed, the recently produced estimates themselves are the best evidence of the degree to which these estimates are entirely new documents.  In addition to hundreds of items that are added or removed, the substantial majority of the entries carried over from the original estimates now differ in unit price, quantity, or both.

[11]   As Plaintiffs' counsel has observed, the failure to provide these estimates in advance of Mr. O'Leary's deposition is the cause of substantial additional prejudice to Nationwide.  (*See* Jan. 6, 2010 Email N. Gaudet to Jerry Wiggins ("I understand that CP are still being worked on, but please send the rest of the Carriage estimates as soon as humanly possible or I think the judge will flip his lid.  He will definitely flip his lid if the CP estimates are not done before Lewis's deposition.") (Ex. 42).)

15

complete interior finish repair without allowance for storm surge and failed to account for the fact that, as Mr. O'Leary and Mr. Wiggins have opined, substantial non-Katrina-caused damage occurred due to Plaintiffs' lack of mitigation efforts. Moreover, Mr. O'Leary and Mr. Wiggins themselves have conclusively rejected the credibility of the WorldClaim estimates.[12] As a result, the WorldClaim estimates are not probative of the scope of wind damage caused by Hurricane Katrina at the Compass Pointe complex.

Michael Fusco, WorldClaim's owner and 30(b)(6) witness, testified that he made six visits to the Compass Pointe site and that he had primary responsibility for overseeing the work of his estimator in creating the company's estimates. (*See* Nov. 20, 2009 Deposition of Michael Fusco at 54 (Ex. 45); *see also* Mar. 21, 2006 Letter M. Fusco to J. Landry at 4 ("I have personally taken over the case … and believe that we are well along in its preparation and evaluation.") (Ex. 46).) Yet despite purporting to have made an estimate of wind damage only, and despite the fact that the parties fully agree that there was significant flood damage to the Compass Pointe properties, Mr. Fusco did not "ma[ke] any effort … to distinguish between damage caused by wind versus damage caused by flooding." (Fusco Dep. at 25-26; *see also id.* at 115.) Similarly, despite Nationwide's provision of tarps to prevent further interior damage, Mr. O'Leary asserts that additional "water damage … continue[d] to manifest itself" after Hurricane Katrina itself. (June 29, 2009 ProBuilders Report of Findings at 2 (Ex. 47).) Yet, as Mr. Fusco admitted, WorldClaim simply estimated the items of loss as they appeared in February and March of 2006, without making "any effort to determine whether additional damage had been caused after Hurricane Katrina by rain intrusion." (*See* Fusco Dep. at 52.)

---

[12]   Despite their heavy criticism of the WorldClaim estimates, Mr. O'Leary and Mr. Wiggins relied on their scope determinations in both their original and their revised estimates, which only further establishes the unreliability of those estimates. (*See* Jan. 26, 2010 Deposition of Jerry Wiggins, *Compass Pointe*, at 94-95 (Ex. 44).)

These and other fatal flaws in the WorldClaim estimates have, in fact, been identified by both Mr. O'Leary and Mr. Wiggins.   Mr. O'Leary admitted — in a document withheld by Plaintiffs until after the close of discovery in the *Carriage House* matter — that:

> World Claims created basically the same set of damages for each apartment.   That might get us in the door but it will begin to lose credibility in deposition phase of a lawsuit and come totally unraveled in front of a jury.   It ***would also not survive scrutiny by an appraisal panel***.   If we are to have ***any hope of credibility***, the scope in each apartment must vary somewhat and I think I know how to get there.

(Planning Memo at CH001182.)   Indeed, as Mr. Wiggins testified, the reason that his original wind-only estimates were so grossly inflated, *see supra* page 13 n.9, is that they included WorldClaim's unsupportable inclusion of substantial amounts of damage below the water line. (*See* Wiggins Dep., *Compass Pointe*, at 95-96.)   Finally, both Messrs. O'Leary and Wiggins made clear that the WorldClaim estimates were substantially affected by Plaintiffs' failure to mitigate additional damages after Nationwide obtained tarps immediately after the storm.  (*See, e.g.*, Nov. 4, 2009 Deposition of Jerry Wiggins, *Carriage House*, at 54, ("[P]rimarily, … there was a substantial length of time between the Nationwide estimate and the WorldClaim estimate. And the photos show that there was tarp problems that would have allowed ongoing water intrusion … .") (Ex. 48); Wiggins Dep., *Compass Pointe*, at 68 (reiterating that he and Mr. O'Leary had decided to use the WorldClaim estimate as a starting point not because it was reliable, but because "there was a time gap between the two estimates"); ProBuilders Report at 2 ("water damage … continue[d] to manifest itself" after Hurricane Katrina itself).)   Under these circumstances, the WorldClaim estimates cannot possibly be probative of the amount of wind damage caused by Hurricane Katrina to the Carriage House properties — the only relevant inquiry in this litigation.   Any minimal probative value is greatly outweighed by the certain misleading and confusion of the jury that would result.

**C.     The Buyers' Renovation Of The Compass Pointe Property Does Not Provide Competent Evidence To Support Any Recoverable Damages.**

Finally, while the Madison Homes repair records discussed above set an absolute ceiling on the total cost to repair and refurbish the Compass Pointe apartments for all damage — whether caused by the wind and water of Katrina or by Plaintiffs' own failure to protect their property — those records in no way distinguish between the several causes of loss and thus cannot constitute evidence of Plaintiffs' alleged damages.   Madison Homes's renovations involved replacement and repairs of not just wind-related damage, but flood damage as well; encompassed considerable (though unquantified) damage that occurred in the months following Hurricane Katrina as a result of Plaintiffs' failure to mitigate; and included substantial upgrades to the existing quality and cost of the property as it stood immediately before the storm.

The Madison Homes repair records provide no means of distinguishing repair work necessitated by covered wind loss versus repair and refurbishment undertaken for other, non-covered causes.   The two documents themselves list repair costs in two formats: first, as aggregated categories of types of work (e.g., drywall, flooring, carpet, etc.); and second, as a listing of persons and companies actually paid to conduct the work.   (*See* Madison Homes Jobs Costs; Madison Homes Profit & Loss by Job.)   Neither of these documents makes a line item listing of damages, or breaks out the repairs by room, floor, unit or even building.   (*See id.*)   Yet there is no question that the Madison Homes records, which list all repair costs incurred by Madison Homes, encompass work to repair not only wind damage, but also to repair flood damage.   (*See, e.g.*, Stewart Dep., *Compass Pointe*, at 28 (describing flood damage to sheetrock); *id.* at 34-36 (estimating that 90% of first-floor cabinetry was replaced, compared with just 20% of second-floor cabinetry and asserting that flood damage to cabinets required replacement of damaged cabinets and undamaged cabinets to match finishes); *id.* at 48-49 (explaining that flood water saturated carpet and caused moisture to accumulate on and damage virtually all of lower-floor electrical system; asserting that "[v]ery little" electrical work was done on second floor); *id.*

18

at 50-51 (asserting that flood damage to first-floor bathroom fixtures required full replacement and explaining that either no or not "many" second-floor fixtures needed repair or replacement); *id.* at 54 (explaining that trim carpentry was required to "replace all the doors and interior trim on mainly the lower units, lower damage by flood water").)  Neither is there any question that the Madison Homes records include substantial upgrades made to the property.  (*See, e.g., id.* at 40-41 (upgrade from vinyl and carpet to ceramic tile flooring); *id.* at 46 (upgrade to metal roofing); *id.* at 52 (upgraded exterior stucco); *see also* Purvis Dep. at 35-36 (undamaged carpet and appliances); *id.* at 41 (porcelain tile, double doors).)  Finally, Mr. Stewart made clear that at the time Madison Homes purchased the property approximately one year after Hurricane Katrina, "there were no effective tarps on the roofs … so you can only imagine how much damage happened in the course of a year."  (Stewart Dep., *Compass Pointe*, at 72.)

In sum, Plaintiffs cannot point to the aggregate repair and refurbishment conducted by the buyers of the Carriage House property as a proxy for their damages case.  Given the irrelevance of the renovation information to the scope of Katrina-caused wind damage, including as it does substantial sums for flood-related repairs, quality upgrades, and damage occurring long after Katrina itself due to Plaintiffs' neglect, Plaintiffs cannot rely on the Madison Homes renovation figures as record evidence in support of their claimed damages.

## III.   PLAINTIFFS ARE NOT ENTITLED TO EXTRACONTRACTUAL DAMAGES.

### A.   Nationwide Had An Arguable Basis To Deny Plaintiffs' Claims.

Plaintiffs' claim for extracontractual damages is fatally flawed, both legally and factually, and thus Nationwide is entitled to summary judgment on these claims.  The Fifth Circuit has held that Mississippi insurance law allows recovery of extracontractual damages only where a plaintiff can show that the insurer had no "arguable basis for delaying or denying a claim." *Essinger v. Liberty Mut. Fire Ins. Co.*, 534 F.3d 450, 451 (5th Cir. 2008) (citing *Universal Life Ins. Co. v. Veasley,* 610 So. 2d 290, 295 (Miss. 1992)).  Put another way, even if Plaintiffs can show that certain consequential damages ***were*** a reasonably foreseeable consequence of the

insurer's failure to pay or delay in paying a claim, the insurer will not be held liable for such damages if it provides a reasonably "arguable basis" for the denial or delay. *Id.* An "arguable basis" means a reason supported by enough evidence to lead a reasonable insurer to deny the claim, even if that basis is ultimately unsuccessful in barring coverage. *Sobley v. Southern Natural Gas Co.*, 302 F.3d 325, 341-42 (5th Cir. 2002).

Plaintiffs cannot show that Nationwide lacked an arguable basis for denying their insurance claim, and thus cannot recover extra-contractual damages. Nationwide conducted a thorough investigation and retained an independent engineering firm to determine the cause and origin of damage to Plaintiffs' property. (*See* Reservation of Rights Letter; Sept. 29, 2005 Letter W. Dus to J. Biggs at NW-2SUN002329 (Ex. 49); NFC Report.) Based on this investigation, Nationwide concluded that part of Plaintiffs' property damage was caused by flood. Plaintiffs do not dispute that this occurred; in fact, Ralph Brockman admitted in correspondence with his investors that he "do[es] not think we can win on wind and storm vs. flood," and indicated that their case depended on recovering for increases in the "cost to rebuild." (Aug. 28, 2006 Letter R. Brockman to Investors at CH001432 (Ex. 50); *see also* R. Brockman Dep. at 78 ("we know that we don't have flood coverage"; "we did not buy flood insurance").) Given that Plaintiffs' dispute with Nationwide focuses not on Nationwide's denial of flood damage, but rather simply the scope and cost of repair of covered wind-related damage, there simply is no record evidence to contradict the conclusion that Nationwide had an "arguable basis" for its partial denial of Plaintiffs' excluded flood-related damages. Where a plaintiff's claims only involve a "legitimate dispute over cause and the amount of covered damages sustained by Plaintiff," and where "[t]here is no substantial evidence that [the insurer] was attempting to improperly exclude wind as a cause," extracontractual (and indeed, even punitive) damages are not recoverable as a matter of law. *Gunn v. Lexington Ins. Co.*, No. 1:07CV478-LTS-RHW, 2008 WL 2039543, at *3 (S.D. Miss. May 12, 2008); *see Legacy Condos. Inc. v. Landmark Am. Ins. Co.*, No. 1:06CV1108-KS-MTP, 2008 WL 80373, at *5 n.4 (S.D. Miss. Jan. 4, 2008).

**B.      Plaintiffs Have Failed To Provide A Calculation Of The Extracontractual Damages For Which They Seek To Recover.**

Beyond the reality that Nationwide had an arguable basis to issue its partial denial of coverage for flood damage to Plaintiffs' property, Plaintiffs' extracontractual damages claim fails for the simple reason that, even at this late date, Plaintiffs have offered no calculation of what those damages are.  Federal Rule of Civil Procedure Rule 26 provides that "a party must, without awaiting a discovery request, provide ... a computation of each category of damages [and] the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based ... ."  Fed. R. Civ. P. 26(a)(1)(A)(iii).  A party must make the initial disclosures required by Rule 26 at or within 14 days of the parties' Rule 26(f) (discovery) conference.  Fed. R. Civ. P. 26(a)(1)(C).  Moreover, under Federal Rule 37, if a party fails to disclose information as required by Rule 26(a), the party is not allowed to use that information to "supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

Here, Plaintiffs have *never* offered a calculation of their extracontractual damages. Plaintiffs' initial disclosures simply assert that "[t]he amount of loss should be resolved by contract appraisal" (Mar. 24, 2009 Pls' Pre-Discovery Disclosures, at 3 (Ex. 51)) — a statement that was rendered inoperative when the Court ordered appraisal of the total loss.  (*See* Aug. 18, 2009 Order [Dkt. 78].)  Despite interrogatory requests and follow-up correspondence in which Nationwide has sought the legal and factual basis for their extracontractual damages claim, as well as the amount and method of calculation of each category of damages Plaintiffs sought to recover, Plaintiffs have failed entirely to offer any substantive information on this claim — deferring instead to unspecified expert witnesses.  (*See* Apr. 30, 2009 Pls.' Disc. Resps., Resp. to Interrog. No. 20 ("This issue will be more fully addressed by expert(s) to be retained by plaintiffs and who will provide reports in accordance to the Court's scheduling order.") (Ex. 52); *id.* Resp. to Interrog. No. 23 ("The amount of compensation, method used to calculate amounts, and

factual basis for each category will be explained in any report(s) provided by plaintiffs' expert(s)."); Oct. 8, 2009 Letter N. Gaudet to K. O'Scannlain ("Plaintiffs produced financial information and an expert to attest to economic damages.").)  However, the expert that Plaintiffs retained to "attest to economic damages," John Myers, did not even attempt to calculate the economic losses that Plaintiffs claim as extracontractual damages.  (*See generally* June 29, 2009 Letter J. Myers to M. Brown (Ex. 53); *see also* Nov. 11, 2009 Deposition of John Myers at 22-23 ("Q: Have you made any determination as to the specific revenue either property could have generated after Hurricane Katrina?  A. No, I have not.  Q. Have you been asked to make such determination? A. No.") (Ex. 54).)

Instead of necessary expert testimony, Plaintiffs have adduced only a flatly inadequate computation that Mr. Brockman provided to Nationwide in the middle of his deposition.  (*See* R. Brockman Dep., *Compass Pointe*, at 181.)  Yet, as Mr. Brockman admitted, his casual, handwritten calculations failed to consider a host of necessary factors.  (*See id.* at 208-209 (admitting that annual figure of $201,348 should be reduced to $157,348 because previous number was "probably … overstated because it's not reflecting interest"); *id.* at 213-14 (admitting that profit from sale of property had not been factored in, but would need to be); *id.* at 214-15 (admitting that calculation failed to account for market fluctuation by assuming 100% occupancy).)  As Mr. Brockman further admitted, reaching an ultimate number based on his projections would require an expert opinion that Plaintiffs have failed to procure.  *See id.* at 212-13 ("Q. You would agree to discount a future revenue stream … you have to use a discount rate and discount it to present value?  … A. Yes.  I've done that.  I've done that in my calculation. Now, we'll see if my counsel gets an appraiser and see what he thinks that you would do.  … Q. You don't know whether the proper discount rate?  A. No, but -- " Q. … You would need an appraiser to get that?  A. That's -- Q. You would have to ask expert to come up with that?  A. And he would use a cap rate. …"); *id.* at 213-14 (discussing discount for profit from sale of property) ("Q. That's province of an expert such as an appraiser or a accountant or an economist;

fair to say?  A. Yes, sir."); *see also* Oct. 20, 2009 Deposition of Ralph Brockman, *Carriage House*, at 188 (admitting that he is not economics expert, has never performed net present value calculation of future income stream, and "[t]here are experts that are available that can do it, and ***I'm certain it would be necessary to prove this claim***") (Ex. 55).)

Nationwide is entitled to summary judgment because Plaintiffs lack a competent calculation of their alleged economic damage and diminution in property value to present to the jury.  In *CQ, Inc. v. TXU Mining Co*., 565 F.3d 268, 279-80 (5th Cir. 2009), the Fifth Circuit upheld the exclusion of a party's evidence on damages where that party failed, without valid justification, to disclose calculations for those categories of damages.  *Id*. at 280.  As the Court noted, allowing such late computation would require modifications to the court's and parties' schedules that would have been prejudicial and unwarranted.  *Id.*; *see also Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179-80 (9th Cir. 2008)  (holding that Rule 37 exclusion is an "automatic sanction" unless a sufficient justification is offered, and that exclusion of damages evidence is appropriate even where a litigant's entire cause of action would thereby be precluded); *Arabian Agriculture Services Co. v. Chief Industries,* 309 F.3d 479, 482-83 (8th Cir. 2002)  (upholding exclusion of damages evidence for failure to disclose a damages computation where there was no substantial justification and where allowing late disclosure would prejudice the plaintiff).  Plaintiffs' failure to adduce a competent extracontractual damages calculation, despite ample opportunity to do so, leaves Nationwide prejudiced by the lack of adequate notice of Plaintiffs' claims and precludes Plaintiffs from offering evidence of extracontractual damages at trial.  *See* Fed. R. Civ. P. 37(c)(1).[13]

---

[13]   The same analysis would apply even if Plaintiffs sought to characterize their consequential damages claim as a contractual one.  Moreover, Plaintiffs cannot, in fact, recover consequential damages on a strictly contractual theory of recovery, given that the contract excludes such damages from its coverage.  (*See* Certified Policy, Bus. Provider Special Prop. Coverage Form BPP-0006 at NW-2SUN000100.) (excluding **"Consequential losses:** Delay, loss of use or loss of market.") (emphasis in original).)

###### C.     Plaintiffs Cannot Base Recovery On Illegal Rent Increases.

To the extent that they still maintain the position, Plaintiffs must be precluded from valuing extra-contractual damages based on windfall profits from post-Katrina rent increases owing to decreased market supply.  Plaintiffs' position regarding the calculation of their claimed extra-contractual damages appears internally conflicted.   On the one hand — perhaps now recognizing that Plaintiffs cannot recover in litigation what they could not legally have charged tenants in the first place — Ralph Brockman testified to a calculation based on the previous year's income of the Compass Pointe property.  (*See* R. Brockman Dep., *Compass Pointe*, at 183 (discussing methodology of "trading 12 months profit and loss statement").)   On the other hand, Plaintiffs' proffered real estate expert, John Myers, opined that similar multifamily apartment properties in the vicinity of Carriage House were able to double the rents they charged after the storm.  (*See* Myers Letter; Myers Dep. at 41-42.)   And as Ralph Brockman testified in the *Carriage House* matter, he believed that this situation would have allowed for an approximately 50% rent hike.  (R. Brockman Dep., *Carriage House*, at 178.)  Plaintiffs cannot seek recovery of such a rent windfall for the simple reason that such a windfall would have violated Mississippi law, and therefore cannot be recovered in this judicial proceeding.

It is axiomatic that a plaintiff cannot recover damages premised on an unlawful act. Mississippi courts have long recognized the venerable maxim, "*ex dolo malo non oritur actio*," or, "no Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act."  *Price v. Purdue Pharma Co.*, 920 So. 2d 479, 484 (Miss. 2006) (quoting *Morrissey v. Bologna*, 123 So.2d 537, 545 (Miss. 1960)); *see Downing v. City of Jackson*, 24 So. 2d 661, 663 (Miss. 1946); *Western Union Tel. Co. v. McLaurin*, 66 So. 739, 740 (Miss. 1914) ("If a plaintiff cannot open his case without showing that he has broken the law, a court will not aid him.").  If a plaintiff's claim is dependant on his own violation of the law, then he has no judicially cognizable claim.  *Price*, 920 So. 2d at 485 (citing *Capps v. Postal Tel. Cable Co.*, 19 So. 2d 491, 492-93 (Miss. 1944)).

24

The same result must be reached here.  Mississippi's price-gouging statute requires that, when "a state of emergency … is declared," "the value received for all goods and services sold within the designated emergency impact area shall not exceed the prices ordinarily charged for comparable goods or services in the same market area at or immediately before the declaration of a state of emergency."  Miss. Code Ann.  § 75-24-25(2).  Violations of this prohibition are punishable by fines and/or imprisonment, and also subject the violator to potential civil liability as an unfair and deceptive trade practice.  *See id* at (3)-(6).  On August 26, 2005, Governor Haley Barbour declared a state of emergency throughout Mississippi.  (*See* Sept. 26, 2005 Memo. re Hurricane Katrina State of Emergency (Ex. 56).)  This state of emergency lasted for the entire state until July 9, 2007, although the emergency condition continued for six Mississippi counties, (including Jackson County, in which Plaintiffs' property is located) until January 11, 2008.  (*See* Feb. 6, 2008 Proclamation Terminating State of Emergency (Ex. 57).)  On November 21, 2005, Attorney General Jim Hood issued an opinion stating that the price-gouging prohibition found in Section 75-24-25 applied to residential real estate leases.  *See* Attorney General Opinion No. 2005-0554, 2005 WL 3775648, at *2 (Miss. A.G. Nov. 21, 2005) (citing *O'Cain v. Harvey Freeman and Sons, Inc.*, 603 So. 2d 824 (Miss. 1991);  *see also* Myers Dep. at 174-75 (discussing "buzz" in Mississippi coast real estate market about legal limits on post-Katrina rent hikes).)  Because Plaintiffs could not legally have hiked the rents charged on Compass Pointe apartments following repairs to the property damage without violating Miss. Code Ann. § 75-24-25, they cannot recover extra-contractual damages premised on such a rent raise in this litigation.[14]

---

[14]   Moreover, this statutory limitation on Plaintiffs' potential for charging tenants higher rents after Katrina is consistent with the long precedent in insurance law that a policyholder can only recover for consequential damages based on pre-storm conditions — in other words, that insureds are not entitled to windfalls simply because they suffered a casualty loss.  *See Catlin Syndicate Ltd. v. Imperial Palace of Miss., Inc.*, No. 1:08CV97-HSO-JMR, 2008 WL 5235888, at *7 (S.D. Miss. Dec. 15, 2008) (calculating loss profits based on profits casino would have generated if Hurricane Katrina had never occurred, rather than the higher post-storm based figures insured claimed); *see also Finger Furniture Co. v. Commonwealth Ins. Co.*, 404 F.3d 312, 314 (5th Cir. 2005) (applying La. law and holding that insured's business income losses should be calculated based on historical sales figures rather than an ex post examination of what actually occurred after the loss).

### D.   Plaintiffs' Dealings And Dispute With Their Mortgage Lender Eviscerate Plaintiffs' Extracontractual Damages Claim Against Nationwide.

Plaintiffs' extracontractual damages claim fails for the additional reason that Nationwide's conduct was not the cause of any such damages.  Under Mississippi law, a plaintiff must prove by a preponderance of the evidence that, *inter alia*, the defendant's alleged conduct was the "cause in fact" of the injury the plaintiff alleges to have suffered — i.e., that the defendant's "act or omission was a substantial factor in bringing about the injury, and **without it the harm would not have occurred**." *A.B. ex rel. C.D. v. Stone Cnty. Sch. Dist.*, 14 So. 3d 794, 800 (Miss. Ct. App. 2009); *Gulledge v. Shaw*, 880 So. 2d 288, 292-93 (Miss. 2004).  Here, the record evidence — documents, Plaintiffs' testimony, even court filings by Plaintiffs and their representatives in another lawsuit filed in this Court — establishes that, if anything, a dispute between Plaintiffs and their mortgage lender brought about Plaintiffs' purported inability to repair the property and lease it for higher rents.  Moreover, evidence from Plaintiffs' post-discovery production in the *Carriage House* matter reveals that Plaintiffs were "excited" to sell their property and reap considerable profits from the transaction as well as the insurance proceeds Nationwide paid, which were never used to repair the property.  Thus, as a matter of law Plaintiffs cannot establish that Nationwide caused any injury for which they now seek to recover extracontractual damages.

Plaintiffs' separate suit against the mortgage servicer, as well as Plaintiffs' testimony and documents in this case, show conclusively that even if Plaintiffs had received whatever additional insurance proceeds they believe Nationwide should have paid them, given the dispute with their lender, Plaintiffs would have not been able to use these funds to renovate Compass Pointe and put its apartments back on the market at higher rent levels — nor were they inclined to do so.  Immediately after Hurricane Katrina, Plaintiffs stopped payments on their mortgage for the Carriage House property.  (*See* Mar. 22, 2007 Declaration of William G. Brockman ¶ 6, *Brockman v. LNR Partners, Inc.*, No. 1:07CV58-LG-JMR (S.D. Miss. Jan. 24, 2007) (Ex. 58).)

This led to their lender, LaSalle Bank, declaring Plaintiffs in default and assigning servicing of the mortgage to LNR Partners, Inc. ("LNR").  As a result, Plaintiffs ultimately turned over the insurance proceeds Nationwide paid to LNR.  Subsequently, the Brockmans and Plaintiffs filed suit against LNR.  (*See* Oct. 21, 2009 Deposition of William Brockman, *Carriage House*, at 8-9 (Ex. 59); *see also* Jan. 24, 2007 Complaint, *Brockman v. LNR Partners, Inc.* (Ex. 60).)  The Plaintiffs asserted in that suit that LNR prevented them from using the proceeds Nationwide paid to repair Compass Pointe.  (*See* Compl. ¶ 22, *Brockman v. LNR Partners, Inc.*; *see also* March 22, 2007 Declaration of John Landry ¶ 12, *Brockman v. LNR Partners, Inc.* ("LNR placed the insurance proceeds in an escrow account which did not bear interest. ***Despite requests by the Partnership to apply such funds towards restoration of the premises and/or satisfaction of the debt, LNR ignored such requests and held such proceeds in a non-interest bearing escrow account***.") (Ex. 61).)  Bill Brockman confirmed this during his deposition.  (*See* Jan. 20, 2010 Deposition of William Brockman, *Compass Pointe*, at 21 (Ex. 62).)

Plaintiffs' admissions preclude their argument that Nationwide caused any extra-contractual damages.  In their litigation against LNR, Plaintiffs made the exact same assertions leveled here against Nationwide: that it was ***LNR***'s alleged wrongful conduct that caused Plaintiffs' purported lost profits damages.  There, Plaintiffs claimed that by writing a "letter demanding payoff of the loans no later than February 28, 2006," "LNR effectively left the Partnerships with selling the property at a distressed value as the only viable option."  (J. Landry Decl. ¶ 13, *Brockman v. LNR Partners, Inc.*; *see* Compl. Prayer for Relief, *Brockman v. LNR Partners, Inc.* (seeking to recover "lost rents, profits and loss of any other opportunities sustained by the Partnerships as a result of the above wrongful acts"); Letter C. McBride to B. Furr at CH001985 ("The Partnership lost the opportunity to realize the profits they would have otherwise realized, had they not been forced by LNR to sell their interests in the properties at a distressed price.")) As Ralph Brockman admitted, LNR Partners did not allow Plaintiffs to use any of the insurance proceeds paid by Nationwide for restoration, which is "why [they] sued

LNR Partners" (even though, according to Mr. Brockman, LNR was "in the right to get a hundred percent" of the fees they had charged). (*See* R. Brockman Dep., *Compass Pointe*, at 71, 180.) There is therefore no material dispute that any funding shortfall was caused by LNR's withholding of insurance proceeds — in addition to the uninsured flood damage that occurred — and not by Nationwide's allegedly insufficient payment.[15]

> **E.** **Plaintiffs Cannot Meet Their "Heavy Burden" In Substantiating Claims For Bad Faith And Punitive Damages.**

Plaintiffs cannot carry their "heavy burden" of proving the "extraordinary remedy" of punitive damages based on their accusations that Nationwide conducted itself in bad faith. *United States Fid. & Guar. Co. of Miss.*, 998 So. 2d at 971 (citing *Sentinel Indus. Contr. Corp. v. Kimmins Indus. Serv. Corp.*, 743 So. 2d 954, 972 (Miss. 1999)); *Dauro v. Allstate Ins. Co.*, No. 1:00CV138RO, 2003 WL 22225579, at *5 (S.D. Miss. Sept. 17, 2003), *aff'd*, 114 F. App'x 130 (5th Cir. 2004). To place this claim before a jury, Plaintiffs are required to establish material issues that — at a minimum — "1) there was no arguable or legitimate basis for denying coverage, and 2) the insurance company acted with malice or gross and reckless disregard for the rights of the insured." *United States Fid. & Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 970 (Miss. 2008) (affirming summary judgment in favor of insurer on bad faith punitive damages claim); *see Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 628 (5th Cir. 2008). Where, as here, the insurer had a "legitimate reason or ***arguable reason***" for denying a claim, "punitive damages will not lie." *Blue Cross & Blue Shield of Miss., Inc. v. Campbell*, 466 So. 2d 833, 842, 851 (Miss. 1984). These standards apply just as forcefully to Hurricane Katrina claimants. *See Broussard*, 523 F.3d at 628-30.

---

[15] Further undermining their position is the fact that, contrary to their claims against both LNR and Nationwide that they were forced to sell their properties at a distressed price, once Plaintiffs learned the property's "as is" appraisal price, they were only too happy to scuttle refurbishment plans in favor of selling the property as-is, at a substantial profit: "I cannot tell you how excited I was to see the 'as is' appraisal for each complex which indicates to me that we should immediately list each complex for sale for the as is price." (Undated Letter R. Brockman to B. Furr at CH001683 (Ex. 63).) Indeed, Plaintiffs sold Compass Pointe for an approximately $730,000 profit over what they had paid to purchase it. (*See* R. Brockman Dep., *Compass Pointe*, at 141, 185, 213.)

Contrary to Plaintiffs' baseless allegations, Nationwide unquestionably had a factually and legally legitimate and arguable reason for its adjustment and partial denial of Plaintiffs' claim.  In adjusting Plaintiffs' insurance claim, "the evidence indicates that [Nationwide] made several attempts to learn what physical damage was due to a covered event, as well as determine what physical damage was due to an excluded peril."  *Gunn*, 2008 WL 2039543, at *3.  Nationwide's adjuster inspected the property and Nationwide explained the nature of the coverage and the status of efforts made to make a coverage decision.  Far from denying Plaintiffs' claim in total, Nationwide issued payments for wind-related damage to Plaintiffs' property totaling $340,139.59 by October 20, 2005.  (*See supra* page 5.)  Including lost rent payments and additional payments tendered as part of Nationwide's good faith obligation to continue to reevaluate Plaintiffs' claim as new information is obtained, Plaintiffs have been paid $564,395.88 to date.  (*See supra* page 10.)

Plaintiffs likely will accuse Nationwide of bad faith merely because the extent of Plaintiffs' loss was in controversy.  But Mississippi courts are reluctant to find bad faith where insurers demonstrate a willingness to reopen and reexamine claims during an ongoing adjustment process.  *See Blue Cross & Blue Shield of Miss., Inc.*, 466 So. 2d at 841 (finding no bad faith in initial denial of claim that was subsequently reopened and paid); *Noxubee Cty. Sch. Dist. v. United Nat'l. Ins. Co.*, 883 So. 2d 1159, 1166 (Miss. 2004) (finding no bad faith where initial denial of claim was subsequently reopened and denied again).  Here, Nationwide reopened its investigation after its initial, substantial payments in 2005 for both Carriage House and Compass Pointe, and indeed issued depreciation hold-back payments in Carriage House based on its mistaken belief that Plaintiffs had conducted repairs.  The insurer then received no information or follow-up from Plaintiffs or their representatives for a period of nearly two years.  (*See supra* page 7.)  Mississippi law does not impose punitive damages where insured are responsible for hampering the investigation into their own claims.  *See Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 420 (Miss. 1987) ("[I]t is difficult to see how the insurance adjuster can be faulted

for bad faith when it is clear that the [plaintiff] did not cooperate with him in his investigation."); *Pilate v. American Federated Ins. Co*., 865 So. 2d 387, 397 (Miss. Ct. App. 2004) (finding no bad faith could be attributed to period of time where "[a]ny delay ... was caused not by [insurer] but by [plaintiff] or his counsel").   And once Plaintiffs demanded an appraisal, Nationwide responded with a proposal that took into account the insurance policy's provision that an appraisal proceeding would not address coverage issues.   That the Court ultimately found this proposal more narrow than the appraisal it ordered, (*see* Aug. 18, 2009 Order), is no basis for imputing bad faith to Nationwide.  *See United States Fid. & Guar. Co. of Miss.*, 998 So. 2d at 971 (reversing award of bad faith damages where insurer had relied on interpretation of contract provision ultimately struck down by court).

In sum, Nationwide denied Plaintiffs' claims based on unambiguous policy terms that have been upheld by the courts and information that was "credible evidence that support[ed] [Nationwide's] conclusions on the basis of which [Nationwide] act[ed].'"  *Legacy Condos*, 2008 WL 80373, at *5 n.4 (quoting *Campbell*, 466 So. 2d at 851).   Because there is a "legitimate dispute over cause and the amount of covered damages sustained by Plaintiff," and because "[t]here is no substantial evidence that [the insurer] was attempting to improperly exclude wind as a cause," punitive damages are inappropriate as a matter of law.  *Gunn v. Lexington Ins. Co.*, No. 1:07CV478-LTS-RHW, 2008 WL 2039543, at *3 (S.D. Miss. Jan. 4, 2008); *see also Legacy Condos. Inc. v. Landmark Am. Ins. Co.*, No. 1:06CV1108-KS-MTP, 2008 WL 80373, at *5 n.4 (S.D. Miss. Jan. 4, 2008).  In these circumstances, the Court "must as a matter of law, remove any claim for punitive damages based on bad faith from consideration by the jury."  *Murphree v. Federal Ins. Co.*, 707 So. 2d 523, 530 (Miss. 1997).

## CONCLUSION

For the foregoing reasons, Nationwide respectfully requests that this Court grant its Motion for Summary Judgment and enter an Order in favor of Nationwide dismissing Plaintiffs' claims as a matter of law.

THIS, the 16th day of February, 2010.

Respectfully submitted,

NATIONWIDE PROPERTY & CASUALTY
INSURANCE COMPANY,
DEFENDANT

By Their Attorneys
WATKINS LUDLAM WINTER & STENNIS, P.A.

By:     */s/ Laura L. Hill*_____
        LAURA L. HILL
        lhill@watkinsludlam.com

H. Mitchell Cowan (MSB No.7734)
Laura Limerick Gibbes (MSB No. 8905)
F. Hall Bailey (MSB No. 1688)
Janet D. McMurtray (MSB No. 2774)

Christopher R. Shaw (MSB No. 100393)
Laura L. Hill (MSB No. 102247)
WATKINS LUDLAM WINTER & STENNIS, P.A.
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, MS  39205
Telephone: (601) 949-4900
Facsimile: (601) 949-4804

Of Counsel:
Daniel F. Attridge, P.C. (Bar No. 44644)
Christian D. H. Schultz (Bar No. 44747)
Robert B. Gilmore (Bar No. 44997)
Kate S. O'Scannlain (Bar No. 45034)
Jeffrey A. Todd (Bar No. 45916)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC  20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

## CERTIFICATE OF SERVICE

I certify that I have this day electronically filed the foregoing using the Court's ECF system, which sent electronic notification of such filing to:

Nathan M. Gaudet
Matthew K. Brown
SULLIVAN, STOLIER AND RESOR, APLC
909 Poydras Street, Suite 2600
New Orleans , LA 70112
504/561-1044
Fax: 504/561-8606
ngaudet@ssrlawfirm.com
mbrown@ssrlawfirm.com


THIS, the 16th day of February, 2010.


By:     */s/ Laura L. Hill*
          LAURA L. HILL
          lhill@watkinsludlam.com